**Record No. 13-414(L)**
**Consolidated With 13-415, 13-418, 13-419, 13-42, 13-422**

**IN THE**

# United States Court Of Appeals

**FOR THE FOURTH CIRCUIT**

EQT PRODUCTION COMPANY, CNX GAS COMPANY LLC,
BUCKHORN COAL COMPANY LLLP,
COMMONWEALTH COAL CORPORATION,
AND HARRISON-WYATT, LLC,

*Defendants-Petitioners-Appellants*,

v.

ROBERT ADAIR, EVA MAE ADKINS,
DORIS BETTY ADDISON, JEFFREY CARLOS HALE,
AND JULIE A. KISER,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents-Appellees*.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ABINGDON
———————————————

## RESPONSE BRIEF OF APPELLEES
———————————————

LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:   (415) 956-1000
Facsimile:   (415) 956-1008
ecabraser@lchb.com

LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
David S. Stellings
Daniel E. Seltz
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:   (212) 355-9500
Facsimile:   (212) 355-9592
dstellings@lchb.com
dseltz@lchb.com

*Attorneys for Plaintiff-Respondents ROBERT ADAIR, EVA MAE, DORIS BETTY*
*ADDISON, JEFFREY CARLOS HALE, AND JULIE A. KISER,*
*on behalf of themselves and all others similarly situated*

*[additional counsel listed on signature page]*

1149711.2

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _13-414(L)_        Caption: _EQT Production Company v. Robert Adair_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Robert Adair, Eva Mae Adkins, Doris Betty Addison, Jeffrey Carlos Hale and Julie A. Kiser, on behalf of_
(name of party/amicus)

_themselves and all others similarly situated_

who is _plaintiff-respondent/appellees_, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ David S. Stellings          Date: _____1/27/14_____

Counsel for: plaintiff-respondent/appellees

## CERTIFICATE OF SERVICE
**************************
I certify that on _____1/27/14_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ David S. Stellings                          1/27/14
(signature)                                          (date)

# TABLE OF CONTENTS

**Page**

I.   Jurisdictional Statement ...................................................................... 1

II.  Statement of Issues ............................................................................ 1

III. Statement of the Case ........................................................................ 1

    A.  Ownership Cases .......................................................................... 2

        1.  CNX's and EQT's Uniform Procedures In Designating
             Conflicting Claims of CBM Gas Ownership. ...................3

        2.  The Virginia Supreme Court Resolved the Question of CBM
             Gas Ownership Ten Years Ago, But the Defendants Chose to
             Ignore the Decision. ...............................................................7

        3.  Underpayment of Royalties ...........................................11

    B.  *Adkins v. EQT*: Breach of a Common Term. ..........................15

    C.  Procedural Background ...............................................................18

IV.  Standard of Review ........................................................................19

V.   Argument .........................................................................................21

    A.  Coal Interest Owners Are Not Necessary Parties. .................22

    B.  There Was No Abuse of Discretion In the District Court's Certification
       of Plaintiffs' Claims for Declaratory Relief. .........................26

        1.  The District Court Identified, But Did Not Resolve, a Common
             Legal Question. .............................................................26

        2.  Re-examination of Individual Title Documents Is Not
             Necessary. ......................................................................29

        3.  The Coal Owners' Arguments Concerning *Harrison-Wyatt* Are
             Irrelevant to Class Certification, As Well As Meritless. ...............30

    C.  The Court Correctly Certified Plaintiffs' Breach of Contract Claims...33

        1.  EQT's Request for the Exercise of Pendent Jurisdiction to
             Review the District Court's Ruling on a Motion to Dismiss
             Should be Denied. .........................................................33

        2.  The Leases Share a Common, Material Term. .............36

        3.  EQT's Policy Arguments Are Irrelevant to Class Certification. ...39

        4.  The Point of Marketability Is a Common Question of Fact. .........41

D.    The District Court Correctly Certified Claims for Royalty Underpayments. ...................................................................42

     1.    CNX's and EQT's Deductions Practices Raise Common Questions of Law and Fact....................................................42

     2.    Purported Lease Variations Do Not Defeat Predominance. ..........45

     3.    Petitioners' Statute of Limitations Arguments Support Affirmance of Class Certification. ...................................................49

     4.    Fraudulent Concealment Depends on Classwide Evidence............51

E.    The District Court's Class Definitions Are Proper..............................55

     1.    Class Members Are Ascertainable..................................................55

     2.    The *Adkins* Class and *Kiser* Subclass Are Ascertainable. .............61

     3.    The Classes Are Not "Fail-Safe." ...................................................62

F.    Individual Damages Issues Do Not Defeat Predominance of Common Issues As to Plaintiffs' Tort Claims......................................................65

     1.    Damages Issues Do Not Predominate............................................65

     2.    Monetary Damages Are Not the Primary Goal of the Claims Certified Under Rule 23(b)(2).......................................................69

VI.    Conclusion ...................................................................................................73

## TABLE OF AUTHORITIES

Page(s)

## Cases

*Abramovitz v. Ahern*,
96 F.R.D. 208 (D. Conn. 1982) ............................................................................51

*Addison v. CNX Gas Co., LLC*,
2011 U.S. Dist. LEXIS 50276 (W.D. Va. May 13, 2011),
*adopted in full*, 2011 U.S. Dist. LEXIS 110724 (W.D. Va. Sept. 28, 2011) .......72

*Adkins v. EQT Prod. Co.*,
2012 U.S. Dist. LEXIS 43171 (W.D. Va. Mar. 28, 2012) ....................................8

*Allison v. Citgo Petroleum*,
151 F.3d 402 (5th Cir. 1998) ..............................................................................71

*American Pipe & Construction Company v. Utah*,
414 U.S. 538 (1974) ............................................................................................48

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ................................................................... 20, 26, 27, 66

*Anderson Living Trust v. ConocoPhillips Co., LLC*,
2013 U.S. Dist. LEXIS 96877 (D.N.M. June 28, 2013). ....................................34

*Anderson v. Merit Energy Co.*,
2008 U.S. Dist. LEXIS 47743 (D. Colo. Jun. 19, 2008) ......................... 37, 38, 62

*Beer v. XTO Energy, Inc.*,
2009 U.S. Dist. LEXIS 23096 (W.D. Okla. Mar. 20, 2009) .................. 37, 39, 46

*BP America Prod. Co. v. Patterson, et al.*,
263 P.3d 103 (Colo. 2011) ..................................................................................51

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..............................................................................53

*Butler v. Sears Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ..............................................................................69

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ..................................................................................20

*Chisholm v. United States Postal Service*,
665 F.2d 482 (4th Cir. 1981) ..............................................................................48

*Clay v. Am. Tobacco Co.*,
188 F.R.D. 483 (S.D. Ill. 1999) ..........................................................................60

*Comcast Corp. v. Behrend*,
　133 S. Ct. 1426 (2013) ................................................................... 65, 66, 67, 68

*DeBremaceker v. Short*,
　433 F.2d 733 (5th Cir. 1970) ............................................................... 60

*Ealy v. Pinkerton Government Services, Inc.*,
　514 Fed. Appx. 299 (4th Cir. Mar. 14, 2013) .............................................. 34, 35

*Farrar v. Mobil Oil Corp.*,
　234 P.3d 19 (Kan. App. 2010) ............................................................. 37

*Freebird v. Merit Energy Co.*,
　2011 U.S. Dist. LEXIS 624 (D. Kan. Jan. 4, 2011) ........................................... 37

*Garman v. Conoco, Inc.*,
　886 P.2d 652 (Colo. 1994) ................................................................ 44

*Genenbacher v. Centurytel Fiber Co.*,
　244 F.R.D. 485 (C.D. Ill. 2007) ............................................................ 64

*Gentry v. Siegel*,
　668 F.3d 83 (4th Cir. 2012) ................................................................ 48

*Gooch v. Life Investors Ins. Co. of Am.*,
　672 F.3d 402 (6th Cir. 2012) ............................................................ 70, 71

*Greghol Limited Partnership v. Oryx Energy Co.*,
　959 P.2d 596 (Okla. Ct. App. 1998) ........................................................ 39

*Hammett v. Am. Bankers Ins. Co. Fla.*,
　203 F.R.D. 690 (S.D. Fla. 2001) ............................................................ 71

*Harrison-Wyatt, LLC v. Ratliff*,
　593 S.E.2d 234 (Va. 2004) ........................................................... passim

*Hershey v. Exxonmobil Oil Corp.*,
　2011 U.S. Dist. LEXIS 36317 (D. Kan. Mar. 31, 2011) .................................. 39, 43, 45

*In re Catfish Antitrust Litig.*,
　826 F. Supp. 1019 (N.D. Miss. 1993) ...................................................... 51

*In re Checking Account Overdraft Litig.*,
　275 F.R.D. 666 (S.D. Fla. 2011) ........................................................... 55

*In re Deepwater Horizon*,
　2014 U.S. App. LEXIS 575 (5th Cir. Jan. 10, 2014) ..................................... 22, 68

*In re Motor Fuel Temp. Sales Pracs. Litig.*,
　2013 U.S. Dist. LEXIS 101082 (D. Kan. July 19, 2013) ..................................... 58

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................51

*In re Rodriguez*,
  695 F.3d 360 (5th Cir. 2012) ................................................................................59

*In re Toyota Motor Corp. Unintended Acceleration Marketing,*
  *Sales Pracs. & Prod. Liab. Litig.*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................................48

*In re Urethane Antitrust Litig.*,
  237 F.R.D. 440 (D. Kan. 2006) ............................................................................51

*Jackson v. Unocal Corp.*,
  262 P.3d 874 (Colo. 2011) ....................................................................................57

*Kendrick v. Standard Fire Ins. Co.*,
  2010 U.S. Dist. LEXIS 135694 (E.D. Ky. Sept. 30, 2010) ........................... 60, 61

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
  571 F.3d 672 (7th Cir. 2009) ................................................................................59

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510, 514 (9th Cir. 2013) ................................................................... 68, 69

*Lienhart v. Dryvit Sys., Inc.*,
  255 F.3d 142 (4th Cir. 2001) ................................................................................20

*Melton v. Carolina Power & Light Co.*,
  283 F.R.D. 280 (D.S.C. 2012) ..............................................................................62

*Mims v. Stewart Title Guaranty Co.*,
  590 F.3d 298 (5th Cir. 2009) ................................................................................59

*Minter v. Wells Fargo Bank, N.A.*,
  279 F.R.D. 320 (D. Md.  2012) ............................................................................54

*Mitchell-Tracey v. United Gen. Title Ins. Co.*,
  237 F.R.D. 551 (D. Md. 2006) ..............................................................................60

*Mittelstaedt v. Santa Fe Minerals*,
  954 P.2d 1203 (Okla. 1998) ..................................................................................44

*Ochoa Lizarbe v. Rivera Rondon*,
  402 Fed. Appx. 834 (4th Cir. 2010) ......................................................................35

*Olden v. Lafarge Corp.*,
  203 F.R.D. 254 (E.D. Mich. 2001) ........................................................................57

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008) .........................................................58

*Pepper v. Dixie Splint Coal. Co.*,
   165 Va. 179 (Va. 1935) .......................................................................72

*Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*,
   2009 U.S. Dist. LEXIS 82522 (W.D. Okla. July 31, 2009) .................57

*Randleman v. Fidelity Nat'l Title Ins.*,
   646 F.3d 347 (6th Cir. 2011) ...............................................................64

*Rogers v. Westerman Farm Co.*,
   29 P.3d 887 (Colo. 2001) ............................................................ passim

*Rux v. Republic of Sudan*,
   461 F.3d 461 (4th Cir. 2006) ........................................................ 34, 35

*Schear v. Food Scope Am., Inc.*,
   2014 U.S. Dist. LEXIS 3454 (S.D.N.Y. Jan. 10, 2014) .....................69

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) .............................................................................49

*Solo v. Bausch & Lomb Inc.*,
   2009 U.S. Dist. LEXIS 115029 (D.S.C. Sept. 25, 2009) ....................60

*Tchoboian v. Parking Concepts*,
   2009 U.S. Dist. LEXIS 62122 (C.D. Cal. July 16, 2009) ...................58

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ........................................................ 54, 65

*U.S. v. Davis*,
   53 F.3d 638 (4th Cir. 1995). ...............................................................65

*Wellman v. Energy Res., Inc.*,
   557 S.E.2d 254 (W. Va. 2001) .................................................. 38, 43, 62

*Williams v. Chesapeake La., Inc.*,
   2013 U.S. Dist. LEXIS 34778 (W.D. La. Mar. 11, 2013)............... 48, 49

*Wood v. TXO Prod. Corp.*,
   854 P.2d 880 (Okla. 1992) ...................................................................15

## Statutes

Va. Code Ann. § 45.1-361.21:1 ................................................... 7, 23, 30

Va. Code Ann. § 45-1-361.21 ...............................................................3

Va. Code Ann. § 45-1-361.22 ........................................................3

Wyo. Stat. § 30-5-304(a)(7) ........................................................34

**Rules**

Fed. R. Civ. P. 23(a) ................................................................20

Fed. R. Civ. P. 23(b)(2) ............................................................28

Fed. R. Civ. P. 23(b)(2)(B) ........................................................58

Fed. R. Civ. P. 23(b)(3) ........................................................ 20, 66

Fed. R. Civ. P. 23(c)(2)(B) ........................................................55

Fed. R. Civ. P. 28(a)(4) .............................................................1

Fed. R. Civ. P. Rule 19 ............................................................56

Fed. R. Civ. P. Rule 20 ............................................................56

Fed. R. Civ. P. Rule 23 ....................................................... passim

Fed. R. Civ. P. Rule 23(a)(2) .............................................. 38, 43, 45

Fed. R. Civ. P. Rule 23(b)(2) ........................................... 42, 65, 69, 72

Fed. R. Civ. P. Rule 23(b)(3) ........................................... 42, 66, 68, 70

Fed. R. Civ. P. Rule 23(c)(2) ......................................................25

Fed. R. Civ. P. Rule 23(d) .........................................................25

**Treatises**

7A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d*
§ 1760 (3d ed. 2005) ..........................................................55

*Manual for Complex Litigation, Fourth* (Fed. Jud. Ctr. 2004)
§ 21.222 ................................................................ 55, 60, 63

*Manual for Complex Litigation, Fourth* (Fed. Jud. Ctr. 2004)
§ 21.311 ......................................................................55

*Newberg on Class Actions*
§ 3:3 (5th ed. 2011) ..........................................................55

**Other Authorities**

Fed. Juc. Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), available at
http://www.fjc.gov/library/fjc_catalog.nsf. .....................................58

## I.    <u>Jurisdictional Statement</u>

The bases for this Court's and the district court's jurisdiction, as well as the filing dates for Petitioners' proposed interlocutory appeal, are correctly described in Petitioners' jurisdictional statement.  The remainder of Petitioners' jurisdictional statement does not comply with Federal Rule of Civil Procedure 28(a)(4)'s requirements, because it improperly and incorrectly characterizes the factual background of the five related cases and the substance of Plaintiffs/Appellees' claims, which Plaintiffs/Appellees address below.

## II.    <u>Statement of Issues</u>

Whether the district court properly exercised its broad discretion when it granted class certification after devoting 56 pages of its 85-page opinion to a comprehensive review of the evidence adduced by the parties during more than three years of litigation and discovery in five cases, and when the remainder of the court's opinion consisted of a careful analysis of the current state of class action law.

## III.    <u>Statement of the Case</u>

The district court certified classes in five related cases.  Four of the cases focus on the straightforward question of whether tens of millions of dollars in royalties that have been sitting in an escrow account for as long as two decades should be released to their rightful owners, the Class members.  The money was placed into escrow by CNX Gas Company, LLC's ("CNX") and EQT Production

Company's ("EQT") as payment of royalties for the production and sale of coalbed methane gas ("CBM") from the Class members' property.

The four cases that involve money sitting in an escrow account for decades – *Adair v. EQT*, *Kiser v. EQT*, *Hale v. CNX*, and *Addison v. CNX* – are collectively referred to herein as the "ownership cases."

The fifth case, *Adkins v. EQT*, is a breach of contract claim in which a class of EQT's lessors allege that EQT breached its contract with them by uniformly underpaying royalties owed to them on the sale of their gas.

## A.    Ownership Cases

The ownership cases arise out of a scandal nearly 25 years in the making in Southwest Virginia.  CNX and EQT have produced and sold CBM gas from Class members' properties in this region since 1990, but as the district court found, as a result of CNX's and EQT's uniform improper interpretation and application of a single statute, Class members have not received a single dollar of the royalties attributable to those sales.  As certified classes, these cases are poised to remedy the situation that CNX and EQT created, by finally allowing the Class members to receive the royalty payments withheld from them for all the years that CNX and EQT profited from the sale of Class members' CBM gas in Southwest Virginia.

### 1.    CNX's and EQT's Uniform Procedures In Designating Conflicting Claims of CBM Gas Ownership.

CBM is a natural gas that resides in coal seams.  As the district court previously found, the Virginia General Assembly enacted the Virginia Gas and Oil Act, Va. Code Ann. § 45.1-361.1 *et seq.* ("Gas Act") in 1990, at a time of "uncertainty in Virginia as to whether CBM was owned by those who retained rights to the gas estate/interest or by those who owned the coal estate/interest in the land."  A1313.  The Gas Act allows operators, such as CNX and EQT, to produce and sell CBM when the CBM's ownership is uncertain or unknown, provided that royalties owed to the CBM owner are held in a state escrow account "pending identification and location of the owner or a final agreement or a determination as to ownership of the CBM estate/interest."  *Id.* (citing Va. Code Ann. § 45-1-361.21 & 22).

Pursuant to the Gas Act, CNX and EQT both created and followed uniform procedures to identify ownership interests in the CBM, to apply for designation as CBM unit operators, to produce and sell the Class members' CBM, and to escrow or otherwise withhold royalties attributable to those sales.  The district court reviewed and summarized this evidence at length in the order granting class certification.  *See* A4503-57.

CNX and EQT wanted to produce and then sell the CBM that resided under Class members' properties.  To that end, and pursuant to the Gas Act, for each

Class member's tract of land, CNX and EQT applied to the Virginia Gas and Oil Board ("Board") to establish forced pooling CBM units (units in which CNX or EQT failed to obtain voluntary leases from all interests). Both CNX and EQT submitted exhibits to its applications to the Board that listed two groups with purportedly conflicting claims to the CBM in each Class member's tract. EQT named the two lists "Gas Estate Only" and "Coal Estate Only." *See* A1963-65; 2066-2076; 2172-80; *see also* A1394-99. In other words, before it was permitted to remove any CBM from the ground under any Class member property, EQT first was required to specify – and in fact did so specify – in its Board application exactly who owned the gas interests and who owned the coal interests in each tract in question.

The same Gas Act provisions applied to CNX. Like EQT, CNX created separate ownership schedules of "Oil and Gas Owners," and "Coal Owners" for each tract subject to escrow. A2583. In their applications and testimony, both CNX and EQT further represented to the Board that the companies had "exercised due diligence" in an effort to identify and locate each of the oil, gas, and coal interest owners identified in the applications. *See* A2792 ¶ 3 (CNX); A1389 (EQT).

As the district court found, both CNX and EQT contended in each of their Board applications that conflicting claims for ownership of the CBM existed

between the gas owners and the coal owners in each tract.  Because of those ostensible conflicts, all of the royalties attributed to the CBM sales were either escrowed or otherwise held in suspense.  They were not paid to the Class members.

The Board routinely accepted CNX's and EQT's representations that conflicting claims existed between the two groups of owners that CNX and EQT identified.  Each of the pooling orders and supplemental pooling orders issued by the Board, establishing CNX or EQT as the unit operator for CBM units, incorporated CNX's and EQT's ownership lists/schedules, and adopted their assertions that "conflicting claims" of CBM ownership existed between gas estate owners on the one hand, and coal estate owners on the other hand.  *See* A1844-57 (example of EQT pooling order); A2006-2012 (EQT supplemental order); A2789-2809 (CNX).  The court below conducted a detailed review of numerous pooling orders and supplemental orders establishing escrow accounts for royalties attributable to each unit (A4514-22) and held that the language of these orders did not vary materially over time.  *See* A4522.[1]

_____

[1] In units in which CNX and EQT obtained voluntary leases from all conflicting claimants they designated, EQT and CNX did not make royalty payments to the "conflicting claimants" or pay royalties into the Board's escrow account, but instead internally "suspended" the royalties.  A2527 ¶ 33 (CNX Answer in *Addison*); A1589 ¶ 33 (EQT Answer in *Kiser*).

CNX's and EQT's sworn statements[2] to the Board concerning gas and coal ownership in the units were the result of uniform procedures that each company followed to determine relevant ownership interests in each CBM unit. EQT identified "Title and Curative Review" as the first step in EQT's preparations for pooling order applications. A1905. As the district court found, EQT asked its attorneys to "certify ownership of the oil and gas underlying all of the subject tracts and … identify for notification purposes the owner of the surface estate and the owner and lessee, if any, of the coal estate." *Id*. at 34-36. As part of this process and throughout the class period, EQT requested that the attorney researching title "certify ownership of the oil and gas underlying all of the subject tracts…." A1913-14 (request for preliminary title opinion dated February 1, 1991).[3] During her deposition, EQT's corporate representative confirmed that as part of the force pooling process, "EQT is going to want to know who owns what." A1700. EQT performed the same extensive title work to determine relevant ownership interests in voluntary units as it did for force-pooled units. A1702-03.

For its part, CNX represented to the Court that it is CNX's "policy" to request title opinions "with respect to various coalbed methane transactions and

[2] The district court specifically noted that EQT's corporate representative testified that "all of EQT's forced-pooling applications were submitted to the Board under oath…." A4542.

[3] *See also* A1916-17 (correspondence of dated April 7, 2000, stating, "The title opinion should certify ownership of the oil and gas estate and the coal estate underlying the subject tract."); A1919 (same for 2003); A1919 (same for 2005).

acquisitions made and entered into by CNX." A4197. CNX's corporate

representatives also testified to CNX's uniform procedures for requesting and

processing title opinions for its Virginia operations. *See* A4342-45; A4347-4310

(confirming CNX's standard procedure for researching title prior to pooling).)

### 2. The Virginia Supreme Court Resolved the Question of CBM Gas Ownership Ten Years Ago, But the Defendants Chose to Ignore the Decision.

The uncertainty that surrounded CBM ownership as between gas interest

owners and coal interest owners ended in March 2004 with the Virginia Supreme

Court's decision in *Harrison-Wyatt, LLC v. Ratliff*, 593 S.E.2d 234, 235 and 238

(Va. 2004). In that case, the Virginia Supreme Court rejected the defendant coal

owner's assertion "that it, as the owner of the coal estate, owns the CBM." The

court held that CBM is a gas and "is a distinct mineral estate" from coal, and that

landowners (gas estate owners) retain the rights to CBM located on their property

when they convey or lease coal rights. *Id.* at 234, 235 and 238.

In 2010, the Virginia General Assembly codified that decision and enacted

Va. Code Ann. § 45.1-361.21:1, which provides in relevant part, "A conveyance,

reservation, or exception of coal shall not be deemed to include coalbed methane

gas." Va. Code Ann. § 45.1-361.21:1. Thus, both the Virginia Supreme Court and

the Virginia legislature made it clear that a claim to CBM royalties based solely on

coal ownership must fail. As a matter of law, CNX's and EQT's designations of

CBM ownership conflicts based on such claims are, according to the Virginia Supreme Court and the General Assembly, illusory.

As the district court concluded after a review of decisions since *Harrison-Wyatt*, state courts in Virginia have applied *Harrison-Wyatt*'s holding consistently, repeatedly and uniformly backing gas interest owners in disputes with coal owners over CBM ownership. *See* A4566-67 ("Virginia circuit courts continue to interpret the *Harrison-Wyatt* opinion as clearly deciding that a conveyance of coal rights does not convey the rights to the CBM."). One leading jurist on CBM issues in Virginia, Judge Keary Williams, has held, "the law in Virginia is settled on the issue of CBM ownership where there is a conveyance, reservation, or exception of coal…" *See Adkins v. EQT Prod. Co.*, 2012 U.S. Dist. LEXIS 43171, at *25 (W.D. Va. Mar. 28, 2012) (quoting *Pobst, et al. v. Garden Realty Corp.*, No. 486-08, slip op. at 2-3).

But despite the *Harrison-Wyatt* ruling in 2004, the state court decisions that followed it, and the state statute that codified it, neither CNX nor EQT changed its practices for either forced-pooling application or for voluntary units (in which the operator has obtained leases from all interests). Rather, both defendants continued to designate illusory CBM ownership conflicts, and continued to withhold royalty payments from the Class members. *See* A2903-07 (pooling order showing CNX's conflicting claimant designations from 2008).

As EQT's corporate representative succinctly put it, "We did not change anything [in response to the *Harrison-Wyatt* ruling]." A1708. At the same time, as the court below recounted in detail, there has been no full accounting of either CNX's or EQT's payments into the state escrow account, and substantial evidence exists of the operators' failure to pay the proper amounts into the account. *See* A4524-30 (describing, among other problems, delayed payments and underpayment of $860,000 over the life of just one single well).

As a result of both CNX's and EQT's actions, and in defiance of settled Virginia law, royalties attributable to Plaintiffs' and Class members' interests have been, or were supposed to have been, placed into the state escrow account, but were not paid to Class members. As of October 2013, there were more than 900 subaccounts established to receive royalty payments attributable to CNX and EQT units in the escrow account, totaling more than $26 million. More than half of the subaccounts attributable to EQT's units contained less than $5,000, while 198 of CNX's 496 units did. Nearly one-third of EQT's subaccounts contained less than $1,000; 127 of CNX's did. Plaintiffs and Class members have received none of those funds. This money will never be released absent class treatment of the Class members' claims.

Plaintiffs seek a declaration under Rule 23(b)(2) that the conflicts that CNX and EQT designated as between those whom they identified as owning gas estate

interests (on the one hand) and those whom they identified as owning coal estate interests and not gas interests (on the other hand) are illusory. The district court identified this question, and the effect of the *Harrison-Wyatt* opinion – as "subject to a common resolution." A4567. Such a declaration – which turns on a single question of state law common to all Class members and which is subject to summary adjudication – will allow the CBM royalty payments held in escrow or suspense to be released to Class members.

The district court certified classes in each of the ownership cases, defining each class by reference to the individuals, or their successors-in-interest, whom *CNX and EQT themselves identified* as owning gas interests in CBM units in conflict with those individuals whom CNX and EQT identified as owning coal interests but not gas interests. The *Adair* and *Hale* classes included those who did not sign leases with CNX or EQT but were instead "deemed leased" and included in force-pooled CBM units, while the *Kiser* and *Addison* classes include voluntary lessors in both force-pooled and voluntary units.

Following class certification, Plaintiffs moved for summary judgment on both their claims for a declaration that the ownership conflicts that CNX and EQT designated do not exist, and for an accounting to determine whether the CNX and

EQT paid the appropriate amounts into escrow.  The resolution of those motions

will simplify and streamline the remainder of this litigation.[4]

### 3.    Underpayment of Royalties

Even as CNX's and EQT's actions caused CBM royalties owed to Class

members to remain out of reach, they also underpaid royalty payments into the

escrow account and into suspense.  In addition to declaratory relief, Plaintiffs seek

a full accounting of CNX's and EQT's handling of the royalties attributable to

Class members' interests, and damages for failure to pay the proper amount of

royalties into escrow or suspense.  Both CNX and EQT used uniform royalty

accounting practices in calculating royalties.  A4412-14 (CNX); A2282 (EQT).  As

to CNX, the district court also found that "voluntary lessors like Addison, with no

special deductions provisions, were subject to" uniform deductions rates.  A4553.

As to EQT, the district court cited to deposition testimony "that EQT calculated all

royalties based on the same methodology." A4543; A2282.  The district court, after

a careful review of the factual record, recognized that Plaintiffs' underpayment

claims arise out of CNX's and EQT's uniform royalty calculation methodologies,

and can be adjudicated on a classwide basis.  *See* A4571.

---

[4] Petitioners complain that Plaintiffs presented no trial plan, but they cite no
authority for the proposition that such a trial plan is required in all class cases.  Nor
would a trial plan assist the trial court or the parties in a case such as this one,
where the remainder of the case hinges in part on to what extent certain key issues
are resolved on Plaintiffs' summary judgment motions.

The pooling orders provide for the deductions that CNX and EQT may take in calculating royalties that are supposed to be paid into escrow, and there is no dispute that such provisions are uniform and apply to all *Hale* and *Adair* Class members.  CNX's and EQT's uniform course of conduct in calculating royalties pursuant to these uniform terms is such that Plaintiffs' claims arising out of these practices will rise or fall on evidence common to all Class members.  The district court had before it several such examples of classwide evidence.

For example, despite any provision allowing them to do so, both CNX and EQT have deducted severance taxes prior to paying royalties into escrow.  CNX has presented severance taxes as a deduction category for all force-pooled units to the Board (*see* A4241), thus presenting a common question that can be resolved as to all Class members in a single proceeding.  CNX acknowledges that this is a uniform, categorical deduction.  (*See* A4335 (CNX Gas Co., LLC's Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories) ("CNX states that it has been deducting taxes when calculating royalty payments from the sale of coal bed gas since January 1, 2004."); *see also* Supplemental Appendix (filed with this response brief) ("SA") 5-6.[5]  EQT's practices are substantially the same.  *See* A2284-85; A2291 (Responses of Defendant EQT Production Company To Plaintiffs' First Set of Interrogatories Dated July 20, 2011).

---

[5] CNX's predecessors also deducted taxes from royalties prior to that date.  A4493-4409.

Another example of a classwide underpayment claim in the CNX cases is whether CNX must base its royalty payments on the profits it realizes through financial hedges tied to the sale of Class members' gas, or on physical sales of Class members' gas. CNX has argued that, as a matter of law, it is entitled to realize the profits from hedging, while paying royalties on another price. A4194 (rejecting CNX motion to dismiss on this issue). Whether CNX is entitled to do this or not is a question common to all Class members, including both voluntary and deemed lessors, and one which can be resolved "in one stroke." *Wal-Mart Stores, Inc. Dukes*, 131 S. Ct. 2541, 2551 (2011).

The question of whether the operators have taken excessive deductions is also subject to common resolution. Contrary to CNX's claims that there is "little evidence in the record about CNX's operations" (Opening Brief ("Br.") at 17), the district court had before it classwide evidence related to excessive deductions, as well. For example, as the district court noted, A4573, the record is that CNX's post-production deductions are the highest of any gas operator in Virginia. *See* A4244-45 (email of Feb. 10, 2009 from Jerry Grantham, showing CNX's post-production costs as $1.36, compared to $0.56 for EQT).

Indeed, although CNX lost a jury trial ("*Levisa*") involving many of the same deductions practices, an attorney for the plaintiffs in that jury trial later wrote to the Board that "CNX continued to deduct from escrowed and force pooled

royalties at an amount greater than that used for" the *Levisa* plaintiffs.  A4249.[6]

That attorney summed up his experience by writing, "[I]t is my opinion that

CNX's deductions against escrowed royalties are not reasonable and that they have

never been reasonable."  A4250.  CNX presented no evidence in its opposition that

the types of deductions it takes from deemed lessors' royalties vary, and discovery

confirmed that they do not.  *See* SA 3-4.  The question of their reasonableness can

be adjudicated on a classwide basis, also across both the *Hale* and *Addison* classes.

Plaintiffs also alleged, and discovery has confirmed, that CNX routinely

produced and sold CBM prior to the entry of pooling orders authorizing it to do so.

SA 24-29 (Hale interrogatory responses, providing 22 such examples out of 67

wells examined).  These actions constitute trespass and conversion, and CNX

should account for 8/8ths of the proceeds attributable to these wells, plus punitive

damages.  This claim presents common legal questions, beginning with the legality

of CNX's conduct, and including the measure of damages if it is found to

constitute trespass or conversion (a common question).

The district court considered this evidence as it concluded that Plaintiffs'

underpayment claims are suitable for class treatment.

---

[6] During discovery, CNX's corporate representative confirmed that CNX did not
change deductions practices after the *Levisa* verdict.  *See* A4350G.

### B.  *Adkins v. EQT*: Breach of a Common Term.

The *Adkins* case does not involve ownership conflicts.  Instead, it involves EQT's deduction of costs from royalty payments belonging to a subset of EQT's lessors whose leases share a common term: they are "silent as to the deduction of costs."  A5260 (order certifying class).  In January 2011, in ruling on EQT's motion to dismiss, the district court held that EQT, as the lessee, "is solely responsible for all costs [of] making the gas produced from the well marketable," unless "the parties specifically agree otherwise."  A766; A1237-38 (overruling objections to Report and Recommendation).

Under the marketable product rule, EQT may not deduct the costs it incurs to make the gas marketable absent an express lease provision permitting it do so.  The *Adkins* class definition –expressly limited to Class members whose leases are silent regarding the deduction of costs – ensures that no Class members have leases that permit EQT to deduct costs.  The district court held that "Virginia courts would impose an implied duty to market on lessees under oil and gas leases."  A764-65.  This implied duty imposes a duty on the operator – EQT – to make the gas marketable.  A765 (citing *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882-83 (Okla. 1992)).

Because Class members' leases are silent as to deductions for costs incurred in making the gas marketable, EQT's liability will turn on the resolution of certain

key questions that are common to all Class members and that can be resolved using evidence common to all Class members. The first question is when the gas EQT sells becomes marketable. Marketability is a defined term: "Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 906 (Colo. 2001). "The determination of whether gas is marketable is a question of fact, to be resolved by the fact finder." *Id.*

Here, Plaintiff Adkins presented evidence on class certification that EQT's gas is not marketable at the well because it is not in a condition to be placed into the interstate pipeline. EQT's corporate representative testified that the gas that EQT produces in Virginia is gathered and compressed before entering the interstate pipeline, and all of EQT's gas in Virginia goes through a separator and filter even prior to reaching the compressor. A2399-2400, A2405-6. As the district court found, EQT's testimony was that "none of the gas produced by EQT in Virginia flows straight from the well into an interstate or intrastate pipeline." A4545. EQT's own affiant on class certification conceded that EQT's gas must be dehydrated. A3852 ¶ 6. The question of where a market exists for EQT's gas can be resolved on a classwide basis.

The second set of questions common to all Class members that will determine EQT's liability involves the costs that EQT incurs, and which deductions it takes from Class members' royalties when marketing and selling the gas. These questions will be answered on a classwide basis.

The district court, after a careful review of deposition testimony from EQT, concluded that "EQT calculated all royalty payments using the same methodology." A4543 (citing to Bergonzi Dep. (A-2280-2285)); 4571. EQT calculated its royalties "based on net proceeds or value minus post-wellhead costs minus taxes equals net value." A4543.[7]

The costs EQT incurs – and passes onto its lessors – in connection with placing its gas into a marketable condition and location does not vary by individual lessor. The district court found that EQT sells to an affiliate, EQT Energy, at the wellhead, and that the price includes a "gathering" charge that is set "based on discussion between the business leaders of the affiliated entities." A4544. For another gas field, the costs are also uniformly applied across royalty owners and set by agreement among EQT and its joint venture partner. *Id.* Those "gathering charges" include property taxes, gathering and compression costs of the gathering system, selling, general, and administrative costs, and electricity costs. A4545.

---

[7] The question of whether EQT attained the highest price possible is also a common one, because as the district court found, "EQT has admitted that, since January 1, 2005, it has sold all of the CBM it produces in Virginia to an affiliate company, EQT Energy." A4571.

With this uniform royalty calculation methodology in place, there is no evidence that EQT modified its royalty payment calculations based on individual lease language where there was no express prohibition against deductions. EQT's corporate representative testified that where a lease is silent as to deductions, it is "company policy" to take them. A2386-87. Thus, the legality of EQT's deductions turns on a company-wide policy and practice that applies to all Class members.

### C.    **Procedural Background**

The four ownership cases and the *Adkins* case were filed between June 2010 and April 2011. The district court has coordinated discovery and pretrial proceedings among the five cases, and the cases were extremely far advanced at the time of the class certification order. Following extensive briefing on Plaintiffs' motions for class certification, which included voluminous documents and excerpts of deposition testimony adduced during more than a year of fact discovery and in which both CNX and EQT were permitted lengthy sur-replies, and after a full day of oral argument, Magistrate Judge Sargent issued an 85-page Report and Recommendation ("Report") on the motions for class certification.

The Report included an exhaustive summary of the evidence proffered by the parties on the motion, and a lengthy analysis of the Rule 23 factors. Both CNX EQT then submitted lengthy objections to the Report, with Plaintiff Adkins

submitting a short objection focused on the Magistrate Judge's apparent oversight of a modified class definition that Ms. Adkins had presented in moving for class certification. The district court judge then held a three-hour-long hearing on the parties' objections. On September 30, 2013, the district court issued its order certifying the classes in each of the five cases, and adopted the modified class definition in *Adkins*.

Following the district court's class certification order, Plaintiffs in the ownership cases moved for partial summary judgment on three issues: the claim for a declaratory judgment that CNX's and EQT's ownership designations are illusory, for an accounting, and on certain claims asserted by certain coal companies which the district court has permitted to intervene in CNX's cases. Those motions for partial summary judgment are currently pending before the district court.

## IV.    **Standard of Review**

"[D]istrict courts have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 424 (4th Cir. 2003) (internal quotation and citation omitted omitted). This Court has emphasized that in the Rule 23 context specifically, "there is no abuse of discretion, as a matter of law, when a reasonable jurist could have made the decision at issue based on the evidence in the record."

*Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009).  In assessing the district court's exercise of its discretion, "We do not ask whether we would have come to the same conclusion as the district court if we were examining the matter de novo." *Id.*

This Court has held that where the district court "conducted a careful Rule 23 analysis, and supported each of its 23(a) and 23(b)(3) holdings with detailed findings," this Court should be especially "reluctant to conclude that the district court abused its considerable discretion[.]"  *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 186 (4th Cir. 1993).

Last term, the Supreme Court clarified the scope of a court's consideration of ultimate merits questions on class certification.  The Court held, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (2013).[8]

_____

[8] Petitioners do not address this Court's multi-part standard for the grant of interlocutory review pursuant to Rule 23(f), set forth in *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 142 (4th Cir. 2001).  Petitioners have (implicitly) addressed only one of the *Lienhart* factors – the class certification order's "weakness" – but do not, and cannot, show that reversal is a "functional certainty," as *Lienhart* requires where a petitioner argues only that factor.  *Id.* at 145.

## V.     <u>Argument</u>

The district court's meticulously detailed class certification order is the very embodiment of the "rigorous" analysis that the Supreme Court has directed trial courts to conduct on class certification.  *Amgen*, 133 S. Ct. at 1194 (citing *Dukes*, 131 S. Ct. 2541).  The district court, over 56 pages, reviewed the extensive factual record before it, and then proceeded to apply Rule 23's factors to Plaintiffs' motions.  Petitioners must clear a high bar to show that such a fact-intensive and careful opinion, which reflects the district court's management of these cases over more than three years, amounted to an abuse of the ample discretion that trial courts are afforded on class certification.

Petitioners do not clear that bar.  Their opening brief is almost entirely a catalog of disagreements with Plaintiffs on the merits of Plaintiffs' claims, but it fails to show that the questions that Plaintiffs' claims raise are anything but common to all Class members, and susceptible to proof with evidence that applies to all Class members.  Petitioners do not challenge several of the district court's findings on Rule 23, including that Plaintiffs have established Rule 23(a)'s numerosity and adequacy requirements, or that, as to claims certified under Rule 23(b)(3), a class action is the superior method for adjudicating these claims.

To the limited extent that Petitioners' brief is tethered to Rule 23, it focuses on the district court's finding that Plaintiffs had satisfied Rule 23(a)(2)'s

commonality requirement and Rule 23(b)(3)'s predominance requirement.  In

*Dukes*, the Supreme Court clarified that courts should determine whether a

common question can be answered in a classwide proceeding, such that the answer

will "drive the resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551.  As the

Supreme Court has held, even a "single common question will satisfy" Rule

23(a)(2).  *Id.*

As set forth below, the central and common questions in this case are

common to all Class members, capable of resolution not only "in one stroke," as

*Dukes* requires, *id.*, but on summary judgment.  Petitioners' challenge to

predominance rests on arguments rejected by this and other Circuits (as recently as

this month in an opinion from the Fifth Circuit that reviewed decisions from

several Circuits[9]), and on a misreading of recent Supreme Court class action

jurisprudence.  There was no error, let alone abuse of discretion, in the district

court's findings, and these cases should proceed to trial.

### A.  <u>Coal Interest Owners Are Not Necessary Parties.</u>

Petitioners' lead argument against class certification in the ownership cases

mischaracterizes both the relief that Plaintiffs seek and the claims that the district

court certified.  The coal interest owners whom CNX and EQT have identified in

their ownership schedules are not necessary parties to decide the central question

---

[9] *See In re Deepwater Horizon*, 2014 U.S. App. LEXIS 575 (5th Cir. Jan. 10, 2014), discussed below.

presented in the ownership cases.  CNX's and EQT's arguments are an attempt to obtain review of a previous decision – an order granting Plaintiffs' motions for leave to amend their complaints – that is not part of this proposed class certification appeal.

Rather than seeking to determine real property ownership, or to obtain an "all-encompassing judicial determination of ownership," as Petitioners contend (Br. at 30), Plaintiffs' class certification motions presented the more limited question of whether the ownership conflicts that CNX and EQT asserted – as a uniform practice and pursuant to uniform procedures – as between those whom CNX and EQT determined own gas interests and those whom CNX and EQT determined own coal interests but not gas interests, are illusory under *Harrison-Wyatt* and Va. Code Ann. § 45.1-361.21:1.  The district court properly held that this question, and whether Class members are thus entitled to the withheld CBM royalties, is "held in common by each of the named plaintiffs and the proposed class members in these … cases and is subject to a common resolution."  A4567. In reaching this conclusion, the district court followed the Supreme Court's directive that a court's Rule 23(a)(2) analysis look to whether a common question exists whose answer will "drive the resolution of the litigation."  *Dukes*, 131 S. Ct. at 2551.

The question of whether CNX and EQT designated ownership conflicts that, as a matter of law, do not exist, does not require the presence of the coal owners whom CNX and EQT – and they alone – named as conflicting claimants. CNX and EQT have framed the common question through their ownership designations, and the district court was correct to recognize that whether CNX's and EQT's designations were in error is a common and central question. Petitioners' arguments concerning the presence of the coal owners are untethered to Rule 23, and identify no error in the district court's careful Rule 23 analysis, which identified the actual – and not invented – common question to be adjudicated.

Petitioners' due process arguments concerning the presence of coal owners are also misplaced, and ignore the actual history of this case, in which coal companies have had and will continue to have ample opportunity to protect their interests. First, four major coal companies were permitted to intervene in the *Hale* case; one, Torch Oil & Gas Company, was apparently untroubled enough by the class certification order that it declined to appeal it.[10] Even as those companies were permitted to intervene in *Hale*, none did so in EQT's cases, and the major coal interest owner who was previously named in the *Kiser* case relinquished its claim to the CBM royalties. *See* A1281 ¶ 17 (Range Resources' Answer to EQT

---

[10] The three companies other than Torch are Buckhorn Coal Company LLLP, Commonwealth Coal Corporation, and Harrison-Wyatt, LLC (collectively "BCH-W").

Cross-Claim, disclaiming interest in CBM royalties in suspense). Those coal owners who have intervened and now seek to appeal the class certification order have based their arguments for an entitlement to CBM royalties on a set of doctrinal arguments that present legal issues capable of summary adjudication on a classwide basis, and indeed, Plaintiffs' motion for summary judgment on those claims is pending in the district court. The coal intervenors' arguments are, in any event, independent of Plaintiffs' claims, and do not affect the propriety of class certification. *See* § V(B)(3) *supra*.

The district court has also recognized that it can address the due process concerns that Petitioners purport to identify. It has stated, and Plaintiffs agree, that "appropriate notice" to coal owners may be given. *See* A2511 (granting motion to amend to proceed against CNX alone and allowing intervention by former coal owner defendants). Such a notice, to issue along with notice to Class members under Rule 23(c)(2), is squarely within the district court's case management powers under Rule 23(d), and negates any due process arguments concerning absent coal interest owners.

Finally, Petitioners' arguments that the coal owners are necessary parties repeat the same arguments that the district court rejected in 2012, when it granted Plaintiffs' motions to amend their complaints to proceed against CNX and EQT alone. *See* A2636 (*Hale*); A1334 (*Adair*). The district court's rulings on those

motions are not part of this appeal.  Further, even if the question of the presence of

coal owners were properly part of this appeal, Petitioners' "necessary party"

argument *supports* the district court's decision to certify the class, because it poses

a classwide question with an answer common to all Class members.

**B.**  **There Was No Abuse of Discretion In the District Court's Certification of Plaintiffs' Claims for Declaratory Relief.**

**1.**  **The District Court Identified, But Did Not Resolve, a Common Legal Question.**

Just last year, the Supreme Court held, "Rule 23 grants courts no license to

engage in free-ranging merits inquiries at the certification stage.  Merits questions

may be considered to the extent—but only to the extent—that they are relevant to

determining whether the Rule 23 prerequisites for class certification are satisfied."

*Amgen*, 133 S. Ct. at 1194-1195.  In its certification order, the district court hewed

closely to that directive, identifying the questions subject to classwide resolution,

while studiously avoiding consideration of merits questions.  The district court

identified as a common question whether the *Harrison-Wyatt* decision means that

no conflict exists between those identified as owning gas on the one hand, and

those owning coal and not gas on the other.  A4567.  But it explicitly did not go the

"further" step that it identified as the ultimate goal of the plaintiffs – a

determination that the gas owners are entitled to the CBM royalties withheld –

identifying it only as "subject to a common resolution."  *Id.*  The district court thus

properly refrained from engaging in "free-ranging merits inquiries." *Amgen*, 133 S. Ct. at 1194-95.

Despite this, Petitioners puzzlingly accuse the district court of resolving this merits question against them, and then, to compound their error, ask this Court to consider the same merits question that the district court properly declined to decide. Petitioners argue that the district court erred in accepting that commonality could be achieved by "simply declaring all conflicts 'illusory' in order to distribute the escrowed money to the class members." (Br. at 34.) But the district court did no such thing; it only identified that issue as the subject of the declaration Plaintiffs seek. A4567. Nor did the district court simply accept the "contention that *Harrison-Wyatt* decided the ownership for all severance deeds in Virginia." (Br. at 34.) The district court stated, in what it specifically stated was dicta, its view that the Virginia Supreme Court has decided that question, but the class certification order itself did not – and could not – make any such finding.

The legal question that the district court identified is perfectly suited for classwide resolution. CNX and EQT do not dispute that they, as a uniform practice and subject to a single statutory scheme, identified the purported conflicts at issue after comprehensive title research designed to identify gas and coal interests for each tract. It is hard to imagine a clearer example of parties who "have acted or refused to act on grounds generally applicable to the class, so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The district court may apply settled Virginia law to determine the effect of CNX's and EQT's designations – whether they were illusory or not (*after* class certification, Plaintiffs asked the district court to do just that).  As such, these cases fulfill what the Advisory Committee envisioned as Rule 23's purpose, as they may "settl[e]the legality of the behavior with respect to the class as a whole."  Fed. R. Civ. P. 23 advisory committee note (1966 amendments).

CNX's and EQT's arguments against this straightforward application of Rule 23 fail.  First, CNX and EQT both attempt to disavow their ownership designations – made after careful research and under oath – as mere "labels," or "for general informational purposes only," and not the basis for certification.  (Br. at 36.)  The schedules were, of course, the basis for the pooling orders that CNX/EQT sought and received, for the subsequent revenues they realized, and for the escrowing of Class members' funds.  EQT cites testimony from its corporate representative that EQT's designations were intended only "to show that a severance had occurred" (A3380), while CNX quotes recently added language in its pooling applications disclaiming "an analysis of the severance deed."  A4793.  But there is no dispute that a severance has occurred, that a thorough title examination conducted, and no further analysis required.  The question for the

district court – and subject to common resolution – is the import of a severance of coal and not gas.  Plaintiffs argue that their ownership of gas under the severance that CNX and EQT identified means that they are entitled to the withheld CBM proceeds.  Whether or not they are ultimately correct, it is a question that may be resolved classwide.

## 2.    Re-examination of Individual Title Documents Is Not Necessary.

CNX and EQT also argue that examination of individual severance deeds is necessary to determine the scope of conflicting claimants' interests.  The district court specifically acknowledged this argument and rejected it, as it "ignores the relief sought" and the proposed class definitions.  A4570.  As the district court recognized, Plaintiffs do not seek a general declaration of property ownership, which CNX and EQT, as a uniform practice, already investigated, but instead seek a declaration as to the narrow and discrete conflict that CNX and EQT identified in their pooling order applications.  The district court cited to specific evidence of both CNX's and EQT's uniform due diligence practices in connection with its pooling applications (A4569-70), and then correctly applied those facts as part of its Rule 23 analysis, and explained why no tract-by-tract review is necessary.  Rather than an overall declaration of gas ownership, the district court correctly recognized that Plaintiffs seek only a "declaratory judgment that all CBM royalties held in escrow or suspense due to alleged conflicting claims of CBM ownership

between persons who operators identified as owning the gas estate and persons they identified as owning the coal estate and ***not*** the gas estate, be paid to the persons identified as owning the gas estate."  A4570 (emphasis in original).

This requires only the application of *Harrison-Wyatt* and Va. Code Ann. § 45.1-361.21:1.  As the district court held, even as it acknowledged that the language of deeds severing the coal estate may vary (A4570), Virginia courts have applied *Harrison-Wyatt* not as limited to the deed in that case, but as a rule that "a conveyance of coal rights does not convey the rights to the CBM."  A4566-67 (citing Virginia state court decisions since *Harrison-Wyatt*).

In arguing that the *Harrison-Wyatt* decision should be limited to its facts (Br. at 37), Petitioners address neither the Virginia law that the district court cited, nor the district court's careful application of the facts in this case to the law.  At bottom, their argument that *Harrison-Wyatt* cannot be applied as a rule simply raises another common question.

### 3. The Coal Owners' Arguments Concerning *Harrison-Wyatt* Are Irrelevant to Class Certification, As Well As Meritless.

In its certification order, the district court properly avoided making rulings on the merits.  BCH-W's primary argument in Petitioners' brief (at pages 38-39), however, fails to appreciate the difference between class certification and the merits, and fails to explain their argument's relevance to Rule 23.  It is also facially wrong.

BCH-W argues, "[T]he district court abused its discretion by failing to analyze BCH-W's arguments that *Harrison-Wyatt* is distinguishable because the CBM wells in *Harrison-Wyatt* were drilled into a mine void containing CBM that had migrated from the coal seam ("gob gas")." (Br. at 38.)  BCH-W further states, "[Plaintiffs'] right to all resulting CBM royalties should be evaluated on the merits." (*Id.*)  BCH-W implies that the class certification orders deny BCH-W the ability to present its case on the merits.  But a class certification opinion is not a merits ruling.  BCH-W's argument is all the more puzzling because the district court has allowed BCH-W to pursue its claims against Plaintiffs. The district court allowed BCH-W to intervene, BCH-W presented its claims, and those claims are presently the subject of a motion for summary judgment. In short, BCH-W is litigating its claims in the district court while appealing class certification orders on the basis that it will not be allowed to litigate its claims.

Ironically, BCH-W's merits-based argument reveals that the district court correctly certified the classes.  If the distinction between gob gas and frac gas makes a difference in ownership of the CBM at issue (it does not), then that difference applies uniformly across the Class.[11]  If anything, BCH-W's argument, baseless as it is, demonstrates that there are common questions of fact and law that

---

[11] The Virginia Supreme Court was well aware of the different methods of producing CBM, *see Harrison-Wyatt*, 593 S.E.2d at 235, and did not limit its opinion to CBM units produced from gob wells, and the statute codifying the decision similarly made no such distinction.

apply to all Class members. By making a substantive argument against the procedural Rule 23 rulings, BCH-W actually proves that this case can and should proceed on a classwide basis.

Second, BCH-W argues, "Assuming that *Harrison-Wyatt* did award Plaintiffs title to the CBM, BCH-W asserts that Plaintiffs nevertheless possess no right to capture the CBM." (Br. at 39.) The simple response to this merits-based argument is that CNX obtained consent to stimulate the coal seams and, thus, BCH-W's contention is not only meritless, it is moot. Relevant to this appeal, BCH-W fails to explain how its argument shows that the district court abused its discretion in certifying the classes. In fact, BCH-W's assertion demonstrates that there are common questions of fact and law that apply across the classes. Whether CNX obtained consent to the stimulation of the coal seams (and there is no dispute that it did) is a common question that does not turn on individualized inquiries.

Third, BCH-W argues that the Plaintiffs' deeds contain general warranties and covenants of quiet possession, and Plaintiffs have violated these covenants. (Br. at 39-40.) This argument is not only without merit and completely irrelevant to the present inquiry, it is facially frivolous. CNX leased CBM gas rights from Plaintiffs. CNX then obtained consent from the coal operators to stimulate BCH-W's coal seams, as required by the Gas Act. § 45.1-361.29(F)(2). In the district court, BCH-W presented not a scintilla of evidence that Plaintiffs did anything to

disrupt BCH-W's rights as coal owners. Plaintiffs are not the gas operator.

Plaintiffs do not maintain any of the wells at issue. BCH-W's argument has no

basis in fact or law. It is the proverbial kitchen sink of an argument. Fatal to

BCH-W, even this kitchen sink argument applies classwide and does not raise

individual issues. If Plaintiffs have violated a covenant of quiet possession by

doing nothing more than signing a gas lease with CNX or being deemed leased by

CNX, then all Class members have done so. This argument, as devoid of merit as

it is, demonstrates that the district court was correct in certifying the classes.

### C.    The Court Correctly Certified Plaintiffs' Breach of Contract Claims.

#### 1.    EQT's Request for the Exercise of Pendent Jurisdiction to Review the District Court's Ruling on a Motion to Dismiss Should be Denied.

EQT has requested that this Court exercise pendent jurisdiction over the

district court's determination – in January 2011 – that Virginia courts would follow

the first marketable product rule.[12] Under this rule, as the district court correctly

explained in denying EQT's motion to dismiss, EQT, as the lessee, "is solely

responsible for all costs [of] making the gas produced from the well marketable,"

unless "the parties specifically agree otherwise." A766; 1237. Following an

extensive analysis of oil and gas jurisprudence from across the country, and of

Virginia law on implied duties, the district court also held that EQT, as the lessee,

---

[12] This issue is relevant only to the *Adkins* class and the *Kiser* subclass.

has an implied duty to market the gas it produces.  A769.  Under the marketable product rule, EQT may not deduct from royalties the costs it incurs to make the gas marketable absent an express lease provision permitting it do so.  In reaching this conclusion, the district court joined the courts of several other gas-producing states that have adopted the "marketable product rule," including Colorado, Kansas, Oklahoma (*see* A764 (citing leading case in each state), and Wyoming (*see* Wyo. Stat. § 30-5-304(a)(7).[13]  The district court denied EQT's request to certify this question to the Virginia Supreme Court.  A1249.

EQT's request that this Court exercise pendent jurisdiction over this issue must fail, as the sole authority it offers for its request makes clear.  As this Court recently held in the sole case that EQT cites, pendent jurisdiction is "an exception of limited and narrow application" to the rule that appellate jurisdiction is limited to final orders, "driven by considerations of need, rather than of efficiency."  *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 Fed. Appx. 299, 308 (4th Cir. Mar. 14, 2013) (citing *Rux v. Republic of Sudan*, 461 F.3d 461, 474 (4th Cir. 2006)).  Pendent jurisdiction is appropriate only "(1) when an issue is 'inextricably intertwined' with a question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is 'necessary to ensure meaningful

---

[13] Recently, a New Mexico district court found that New Mexico would also follow the marketable product rule.  *See Anderson Living Trust v. ConocoPhillips Co., LLC*, 2013 U.S. Dist. LEXIS 96877, at *141-42 (D.N.M. June 28, 2013).

review' of an immediately appealable issue." *Id.* at 309 (quoting *Rux*, 461 F.3d at 475). As this Court explained in *Ealy*, an issue is inextricably intertwined with an immediately appealable interlocutory issue… when resolution of the appealable issue 'necessarily decides' the pendent issue." *Id.* (internal quotation omitted).

EQT cannot meet this standard, as *Ealy* makes clear. In that case, this Court, while reviewing a class certification order, refused to invoke pendent jurisdiction over the denial of partial summary judgment on the appellees' state law claims based on the federal enclave doctrine. This Court rejected the appellee's argument that class certification issues were inextricably tied to the state law claims. Instead, the Court held that class certification and the federal enclave doctrine "are distinct legal concepts. Whether Appellees have satisfied the Rule 23(a) prerequisites for class certification has no bearing on whether Appellees' state law claims are ultimately barred under the federal enclave doctrine." *Id.* at 310. The Court specifically noted that "we have previously refused to invoke pendent appellate jurisdiction even though a determination of the pendent issue had the possibility to foreclose the underlying suit." *Id.* at 310 n.12 (citing *Ochoa Lizarbe v. Rivera Rondon*, 402 Fed. Appx. 834, 837-38 (4th Cir. 2010)).

This Court's holding directly applies to this case, which involves, like *Ealy*, a straightforward application of Rule 23 and a petitioner-appellant's request for review of a separate and distinct legal issue – whether Virginia courts would apply

the first marketable product rule.  The district court did not mention the first

marketable product rule in its certification order, and certification did not depend

on the application of the rule.  Plaintiffs alleged, and the district court certified,

claims that are independent of that rule, including EQT's failure to obtain the

highest price possible on the sale of its gas, undisclosed volumetric deductions, and

excessive and/or improper deductions from royalty payments.  *See* A4571.  Class

certification was appropriate independent of the application of the marketable

product rule, and pendent jurisdiction is not appropriate.

### 2. <u>The Leases Share a Common, Material Term.</u>

EQT does not identify any error in the district court's Rule 23 analysis in

certifying the breach of contract claims in *Adkins*.  Instead, it makes a series of

merits-based arguments against the application of the marketable product rule.

EQT's arguments weigh in favor of, not against class certification, because they

point out the numerous issues of law and fact that can and will be resolved on a

classwide basis.

EQT argues that the presence of purportedly conflicting lease terms, such as

leases providing for royalties based on "proceeds" of sales at the well and the

"market value" of sales at the well, are relevant (Br. at 45-46), although it does not

identify how these lease terms affect the Rule 23 analysis.  That is because these

variations are irrelevant.  As the *Adkins* Class and *Kiser* subclass are defined, all

Class members' leases are the same with respect to the one issue that is material to their claims: they do not contain language allocating to the lessor the costs of making gas produced from the Class wells marketable, and thus do not permit deductions from the royalty payments of costs for operations necessary to make the gas marketable. Those costs are allocated to EQT. *See* A764 (ruling on EQT's motion to dismiss).

Court after court has rejected the argument that such differences defeat class certification. In *Farrar v. Mobil Oil Corp.*, 234 P.3d 19 (Kan. App. 2010), the court cited a host of such cases where courts have rejected precisely the argument made here by EQT (which the *Farrar* court derisively called the "de rigeur defense in these class actions). *See id.* at 30-31 (citing three cases); *Freebird v. Merit Energy Co.*, 2011 U.S. Dist. LEXIS 624 at *15-16 (D. Kan. Jan. 4, 2011) (specifically rejecting the distinction pressed by EQT here); *Beer v. XTO Energy, Inc.*, 2009 U.S. Dist. LEXIS 23096, at *15 (W.D. Okla. Mar. 20, 2009) (certifying class and rejecting lease predominance defense and rejecting "attempts to manufacture conflicts between the class members based on differences in lease language and Btu content of the wells"); *Anderson*, 2008 U.S. Dist. LEXIS 47743, at *13-14 (citing *Rogers*, 29 P.3d 891, n.1).

As these courts have recognized, any purported variations in the leases are outweighed by the requirement central to Plaintiffs' claims, and common to all

leases included within the Class definitions, that EQT has an implied duty to market the gas produced under all the leases. Under the Class and subclass definitions, all Class and subclass members' leases are silent as to the allocation of post-production expenses to lessors; no express term negates the implied duty to market. As Colorado courts applying the "first marketable product" rule have held, "variations in the language of the royalty payment provisions are immaterial provided that there is no express lease provision addressing the allocation of post-production costs." *Anderson v. Merit Energy Co.*, 2008 U.S. Dist. LEXIS 47743, at *21 (D. Colo. Jun. 19, 2008) (citing *Rogers*, 29 P.3d at 897 & 906) (finding predominance of common questions in case involving four different royalty provisions, all silent as to deductions).

EQT's argument that a provision allowing for payments based on sales "at the well" can mean only one thing (Br. at 47) simply raises a common legal question that can be answered on a classwide basis. Courts have specifically held that such language is silent as to allocation of costs to the lessor. *See Rogers*, 29 P.3d at 912; *Wellman v. Energy Res., Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001). EQT may disagree with those holdings, but whether it is correct or not, its argument raises no individual issues, and illustrates why Rule 23(a)(2)'s commonality requirement is satisfied.

EQT's argument also ignores the overwhelming evidence of its own common course of conduct toward all lessors, regardless of lease language. EQT does not – and cannot – argue that it has distinguished between "proceeds" and "market value" leases in its royalty payments calculations. More important than minor variations in the language of the leases is the uniform nature of EQT's deductions and accounting methodology. *See, e.g., Greghol Ltd. P'ship v. Oryx Energy Co.*, 959 P.2d 596 (Okla. Ct. App. 1998) (holding that where defendant used the same methodology to calculate gas royalties paid to class members without regard to specific language of their royalty agreements, there was a common question as to whether deductions from gas royalties for compression charges were appropriate); *Beer*, 2009 U.S. Dist. LEXIS 23096, at *15 (certifying class despite differences in lease language because "defendant's identical treatment of all royalty owners has made these differences irrelevant"); *Hershey v. Exxonmobil Oil Corp.*, 2011 U.S. Dist. LEXIS 36317, at *34 (D. Kan. Mar. 31, 2011) ("The defendant's classwide treatment of prospective members, following a unified underlying royalty methodology, supports the conclusion that class issues will predominate.").

### 3. EQT's Policy Arguments Are Irrelevant to Class Certification.

EQT devotes substantial space to stating its policy preferences regarding the first marketable product rule. (*See* Br. at 48-49.) Not a single sentence of EQT's

recitation of academic opinions on this subject relates to class certification, or any error in the district court's rigorous Rule 23 analysis, let alone an abuse of discretion.

As a substantive matter, EQT is also incorrect.  First, it wrongly asserts that the district court, in denying EQT's motion to dismiss, based its holding that Virginia would apply the marketable product rule on "policy grounds." (Br. at 41.) The district court's careful and lengthy analysis, which speaks for itself, was not a policy discussion, but a thorough review of both Virginia contract law and well-developed oil and gas jurisprudence from other states.  *See* A763-69.

Second, EQT's own policy arguments present only a caricature of the issue of whether an operator may deduct costs without a lease provision permitting it to do so.  EQT argues that the first marketable product rule should not apply in Virginia "because Virginia courts would not rewrite or ignore express lease language."  (Br. at 40-41.)  No state's courts would "rewrite or ignore express lease language," but the concept of implied duties is not novel, in Virginia, or elsewhere, as the district court's thorough discussion of the issue demonstrated.  *See* A766-67 (reviewing Virginia law on implied duties).  Allowing Plaintiff and the Class to pursue a breach of these implied duties is not remotely like rewriting a contract.

### 4.     The Point of Marketability Is a Common Question of Fact.

EQT incorrectly argues that there are no common answers to the question of where EQT's gas is marketable.  (Br. at 55.)  While it criticizes courts generally for their application of the rule (*see* Br. at 50-51), EQT does not identify any abuse of discretion by the district court.  In fact, the question of whether and where the gas is marketable is common to all Class members, and raises no individualized questions.

The point of marketability is a fact question.  "Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace."  *Rogers*, 29 P.3d at 906.  Plaintiffs have argued that EQT sells its gas in an unmarketable condition at the well.  *See* A226.  Contrary to EQT's contentions, Plaintiffs presented a wealth of evidence at class certification demonstrating EQT's gas is not marketable at the well; it must be, at a minimum, dehydrated prior to reaching the interstate pipeline.  *See* A2399-2408; 2413-17.  Plaintiffs may be correct that EQT's gas is not marketable at the well, or EQT may be.  Plaintiffs may be correct that there is no market (including, for example, multiple buyers and sellers) at the well, or EQT may be.  The answer will not vary by Class member: if Plaintiffs are correct that EQT's gas is not marketable prior to entering the interconnect point of an interstate

pipeline, then EQT will be liable for the deductions it incurs (and which it does not

dispute it takes) in placing its gas in a marketable condition and location.  If EQT

is correct, and there is a market for its gas prior to that point, then it will prevail on

this point as to all Class members.  These questions demonstrate why the district

court was correct in certifying the class in *Adkins* and the subclass in *Kiser*.

However these questions are adjudicated, they can be resolved "in one stroke."

*Dukes*, 131 S. Ct. at 2551.

> **D.    The District Court Correctly Certified Claims for Royalty Underpayments.**
>
> > **1.    CNX's and EQT's Deductions Practices Raise Common Questions of Law and Fact.**

In the ownership cases, the district court carefully separated Plaintiffs'

claims for underpayment of royalties, which it certified under Rule 23(b)(3), from

Plaintiffs' claims for declaratory relief, which it certified under Rule 23(b)(2).  The

district court summarized the underpayment claims by stating that these claims

"revolve around the price of the CBM as sold by the operators, the volume of

CBM and the amount of post-production deductions taken from the sale proceeds

before calculating royalties."  A4571.  The court then reviewed both CNX's and

EQT's deductions practices, setting forth the standard deductions that CNX and

EQT take from its lessors.  Those findings reflected ample evidence put before the

district court that both CNX and EQT employ a uniform royalty calculation

methodology, which they apply across their lessors. *See* A4412-14; A2282; 4572-73. There was no error in the district court's conclusion that the questions of whether each operator may take certain deductions and whether they were excessive are common to the class.

Petitioners' attempt to identify an abuse of discretion in the district court's straightforward application of Rule 23 to the facts before it fails. Petitioners focus on Rule 23(a)(2)'s commonality requirement, but do not grapple with a host of questions relating to Plaintiffs' underpayment claims that easily satisfy Rule 23(a)(2)'s requirement that a single common question of law or fact be present.

For example, there is no dispute that both CNX and EQT have, as a uniform policy, deducted severance taxes in calculating royalties. A4335; A2284-85; A2291; A4493-4409. Whether these deductions are permitted under the terms of the uniform deemed leases is a common question of law, satisfying Rule 23(a)(2). In a decision certifying a class of gas royalty owners, a court recognized this question as a common one. *See Hershey*, 2011 U.S. Dist. LEXIS 36317, at *14.

While the propriety of severance taxes may raise a common question of law, or a mixed question of law and fact, a common question of fact is whether the deductions that CNX and EQT take are excessive. CNX and EQT, as gas lessees, bear the burden of demonstrating the costs they have deducted are reasonable. *See, e.g., Wellman*, 557 S.E.2d at 265; *Garman v. Conoco, Inc.*, 886 P.2d 652, 661

(Colo. 1994); *Mittelstaedt v. Santa Fe Minerals*, 954 P.2d 1203, 1208 (Okla.

1998); *Fankhouser v. XTO Energy, Inc.*, 2012 U.S. Dist. LEXIS 31404, at \*13

(W.D. Okla. Mar. 8, 2012) ("Under both Oklahoma and Kansas law, it is

defendant's burden to show that post-production costs were reasonable."). This,

too, is susceptible to common proof, because CNX's and EQT's course of conduct

has been common to all Class members.

The question of whether CNX may legally produce CBM prior to obtaining

a pooling order from the Board also provides a textbook opportunity for the Court

to adjudicate a common question of liability, and then, if necessary, determine

individual damages stemming from that conduct. This is the procedure endorsed

by numerous courts in a variety of contexts. *See, e.g., In re Whirlpool Corp.*

*Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 853 (6th Cir. 2013);

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491

(7th Cir. 2012); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 541-42 (N.D.

Cal. 2012); *A-W Land Co., LLC v. Anadarko E&P Co. LP*, 2013 U.S. Dist. LEXIS

88215, at \*10 (D. Colo. Jun. 24, 2013); *see also* section IV(F) below.

Petitioners' royalty calculations have been systematic and uniform. Their

arguments against commonality amount to a contention that individual damages

calculations will present challenges, an argument that this Court has repeatedly and

soundly rejected. *See Gunnells*, 417 F.3d at 427-28 (collecting authority); *see also*

*Hershey*, 2011 U.S. Dist. LEXIS 36317, at *16 ("While the damages incurred by plaintiffs may well differ, all of the class shares an interest in determining the legality of the deductions charged by Exxon.").

**2.      Purported Lease Variations Do Not Defeat Predominance.**

CNX and EQT argue that purported lease variance among Class members defeats typicality and commonality in the cases involving voluntary lessors.[14] CNX and EQT fail to show an abuse of discretion, or any error in finding that Plaintiffs satisfied both Rule 23(a)(3)'s typicality requirement and Rule 23(a)(2)'s commonality requirement.

In the EQT cases, the *Adkins* class and the *Kiser* subclass are both defined by reference to a common, *material* lease term – the leases' silence as to the allocation of costs.  As explained above, none of the Class members' leases include terms that negate EQT's implied duties as a gas lessee.  In these cases, Plaintiffs have alleged a common breach of those implied duties through EQT's undisputed "company policy" of deducting the costs associated with placing EQT's gas into a marketable condition and location.  The question of where EQT's gas is marketable and what deductions it may take from its royalty payments to place its gas into a marketable condition and location are both common questions, satisfying Rule 23(a)(2).  *See* § III(B), *supra*.  EQT also does not contend that it took

---

[14] This argument does not apply to the *Hale* or *Adair* classes, as those Class members were "deemed" to have leased their gas interests.

purported lease variations among Class members into account in calculating royalties. Under these circumstances, there was no abuse of discretion in finding commonality satisfied, as EQT's "identical treatment of all royalty owners" renders such differences immaterial. *Beer*, 2009 U.S. Dist. LEXIS 23096, at *15.

Moreover, notwithstanding CNX and EQT's glancing assertion that typicality is lacking, EQT points to no purported lease variance that would establish a conflict between Ms. Adkins and *Adkins* Class members, or between Ms. Kiser and *Kiser* subclass members, let alone one that is "fundamental" and "go[es] to the heart of the litigation," as is required to defeat typicality. *Gunnells*, 348 F.3d at 430-31.

CNX, too, fails to show how purported differences among the *Addison* Class members' leases are material, or affect typicality or commonality. The district court correctly found that CNX uses a "form lease," and deviations from that form must be approved by multiple levels of management. A4573; A4348-49 (deposition excerpt of CNX corporate representative). The form lease includes standard deductions rate language (A4350B), and has a standard royalty rate, which is Ms. Addison's. A4350-4350A; SA 4.

The only specific challenge to the finding that Ms. Addison's claims are typical of other Class members' is CNX's assertion that Ms. Addison faces a unique defense because of the notice provision in her lease. This argument is

meritless. The district court earlier found that Ms. Addison adequately alleged notice of CNX's breaches, *see* A4189-90, and CNX concedes that Ms. Addison provided notice to CNX. (Br. at 64.) Thus, CNX's notice arguments do not constitute a defense to Ms. Addison's claims, let alone a unique one.

Nor is there a conflict between those like Ms. Addison, who have a notice provision, and those who do not. Ms. Addison's notice can speak for those who do have such a notice, and is not necessary for those whose leases contain no notice provision.

CNX's insistence that each class member must provide individual notice for the case to proceed as a class action would be extraordinarily inefficient, and would nullify Rule 23 of the Federal Rules of Civil Procedure. CNX argues, in effect, that lessors like Ms. Addison, by signing a lease that contains a notice provision, implicitly agree to a waiver of any right to bring a class action. But there is no such waiver term in Ms. Addison's lease. If CNX wished to include a class action waiver in its leases, or a provision prohibiting Ms. Addison from suing on a representative basis, it could have inserted such a term.

Further, CNX's argument that each Class member must file individual notice letters, even as their claims are tolled by Ms. Addison's class action, is contrary to decades of Supreme Court jurisprudence aimed at preventing exactly this type of inefficiency. In *American Pipe & Construction Company v. Utah*, 414 U.S. 538,

550 (1974), the Supreme Court held that that when a class action is filed, putative class members do not need to file separate actions to preserve their claims under the statute of limitations. *See id.* at 550 ("Rule 23 is not designed to afford class action representation only to those who are active participants in or even aware of the proceedings…."). The *American Pipe* court recognized that class actions are "designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Id.* at 551.[15]

CNX relies on *Williams v. Chesapeake La., Inc.*, 2013 U.S. Dist. LEXIS 34778 (W.D. La. Mar. 11, 2013), to argue that no class can be certified because of Ms. Addison's notice provision. *Williams*, which involved the Louisiana Mineral Code's notice provision, has no application here. The *Williams* court explained at length the unique circumstances of that case, in which the Court acknowledged that the Louisiana Mineral Code's notice provision was in conflict with Rule 23 of the Federal Rules of Civil Procedure, making class actions by Louisiana mineral

---

[15] In light of these principles, plaintiffs routinely provide required notice on behalf of a putative class in a variety of contexts. *See In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Pracs. & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1175 (C.D. Cal. 2010) (holding that named plaintiffs may satisfy the notice requirements of California's Consumers Legal Remedies Act on behalf of the putative class); *Gentry v. Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) (joining "the vast majority of other circuits" in allowing class proofs of claim, recognizing that both agents and "putative agents" of creditors may assert claims in bankruptcy); *Chisholm v. United States Postal Service*, 665 F.2d 482, 490 (4th Cir. 1981) (holding in Title VII case that absent class members need not file charges with the Equal Employment Opportunity Commission if named plaintiff has done so).

lessors impossible.  *Id.* at *12-13.  The Court then applied Justice Stevens'

plurality opinion in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,

559 U.S. 393 (2010), and held that, in that case, Rule 23 must yield to the

substantive state law.  *Williams*, 2013 U.S. Dist. LEXIS 34778, at *16.  No such

state statute and no such conflict exists here that would allow CNX to nullify Rule

23 in the name of a notice provision, let alone one with which Ms. Addison

complied.

### 3.    Petitioners' Statute of Limitations Arguments Support Affirmance of Class Certification.

CNX and EQT's arguments concerning the statute of limitations go to merits

issues connected neither to class certification nor to the order they challenge.  Even

if those arguments were properly before this Court, they support class certification,

as they raise questions common to all Class members and capable of classwide

resolution.

CNX and EQT first argue that the district court erred in holding, on motions

to dismiss, that the statute of limitations does not begin to run on ownership claims

until ownership was established.  (Br. at 65.)  The district court held that the Gas

Act contained no limitation for bringing claims such as the ones brought here to

determine ownership, and that the statute of limitations could not begin to run on

such a claim "prior to the plaintiff having a property right that could be legally

enforced."  A998.  Petitioners now argue that the statute of limitations actually

began running in 2004, when *Harrison-Wyatt* was decided. (Br. at 66.) This is nonsensical, as Petitioners continue to challenge the effect of the *Harrison-Wyatt* decision in this case, including throughout their brief. Because of the position CNX and EQT have taken, Class members are still not in a position to be able to enforce their rights. CNX and EQT have merely identified a common question, capable of classwide resolution, and their arguments concerning the merits of the district court's decision on motions to dismiss are not properly before this Court.

The district court previously addressed, also on a motion to dismiss (*see* A761), Petitioners' argument that the statute of limitations should begin to run on claims concerning royalty underpayments "when the methodology was first employed." (Br. at 66.) Petitioners' argument is apparently that Class members, including those whose ownership rights have not been judicially determined and who have never received any royalty payments, must have challenged a royalty methodology they had no way of knowing about or understanding. EQT presented nothing to indicate that it takes any steps to inform Class members of the amount or nature of the deductions it takes before depositing money into suspense or escrow. Whatever the merit of Petitioners' argument, however, it only supports a finding that the district court properly exercised its discretion, as the applicability of the statute of limitations raises an issue common to all Class members.

### 4.    Fraudulent Concealment Depends on Classwide Evidence.

EQT argues that Ms. Adkins' allegation of fraudulent concealment in her case defeats class certification.[16] (Br. at 67.) EQT is wrong. The district court correctly found that "the doctrine of fraudulent concealment does not focus on the actions or knowledge of the plaintiffs, but on the actions of the defendant." A4574. This conclusion is consistent with legions of authority, including other gas royalty cases,[17] that have held that a defendant's affirmative defense of the statute of limitations may be resolved on a classwide basis.[18] The same is true here.

---

[16] Fraudulent concealment is not at issue in any of the four other cases, as Petitioners concede. (*See* Br. at 67.)

[17] *BP America Prod. Co. v. Patterson, et al.*, 263 P.3d 103, 112 (Colo. 2011) (stating that "[m]ost courts have rejected [the] line of reasoning"  seeking a "per se rule barring class actions involving the fraudulent concealment defense to the statute of limitations").

[18] *See, e.g., In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 452 (D. Kan. 2006) ("[T]he common issue of concealment will predominate because the key inquiry will focus on the defendants' conduct – that is, what the defendants did – rather than on the plaintiffs' conduct."); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1038 (N.D. Miss. 1993) ("Rather than demanding individualized proof of actions by various class members, the court perceives that questions common to the class would predominate the analysis of fraudulent concealment in determining the applicable statute of limitations. For example, any evidence of acts of concealment would be common to the class…"); *Abramovitz v. Ahern*, 96 F.R.D. 208, 218 (D. Conn. 1982) (cited by district court at A4574); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 520 (S.D.N.Y. 1996) ("Courts have overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the common question of whether Defendants successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs.").

In Ms. Adkins' case, the misrepresentations and omissions that constitute EQT's fraudulent concealment of its breach of contract are uniform across all Class members. Ms. Adkins put evidence before the district court on class certification that EQT uniformly deducts from its royalty payments not only the "gathering" charges EQT states that it discloses, but also compression charges and "selling, general, and administrative" charges that it does not disclose. A2290-91 (EQT responses to interrogatories dated July 20, 2011); 2424-26 (EQT check stubs). Ms. Adkins showed that EQT also does not disclose the nature of the deductions it takes. *See* A2374-76; A2438-39 (EQT interrogatory responses of December 15, 2011); A2424 (check stub). Nor does EQT properly disclose the volumetric deductions imposed upon Plaintiff and the Class members. *See* A2377-78; A2411-12.[19] Like the *Patterson* case, a gas royalty case from Colorado, this case involves a "common method to communicate with Plaintiffs," and scant evidence of individual interactions with Class members. *Patterson*, 263 P.3d at 113 & 108.[20]

---

[19] Because this is classwide proof, the subsequent proceedings that the district court contemplated (A4574) to address reliance will not be necessary.

[20] EQT's lengthy recitation of events (Br. at 68-69) concerning Ms. Cox, a former plaintiff, is both irrelevant and misleading. For example, the letter that EQT sent to Ms. Cox is evidence of EQT's ongoing concealment. A3896-97. The letter failed to disclose that EQT was taking deductions not just for the "movement" of gas, but to place the gas in a marketable *condition*. It failed to disclose that EQT was also deducting property taxes and selling, general, administrative, and depreciation expenses, as well as pipeline capacity charges. A2289-90. Nor did

*Footnote continued on next page*

On the other hand, this case is clearly distinguishable from the two cases that EQT wrongly asserts set up a *per se* bar to class certification in cases involving fraudulent concealment.  The first, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), involved a proposed class of franchisees who "potentially had access to several alternative sources of the information alleged to have been fraudulently concealed."  *Id.* at 342.  This Court found that equitable tolling could be applied only upon "individualized showings that are non-typical and unique to each franchisee…. the alleged misrepresentations and obfuscations on which plaintiffs base their argument for tolling differed from franchisee to franchisee."  *Id.*  In *Broussard*, fully half of the contracts at issue contained a material term that the other half did not.  *Id.* at 340.  As one court in this Circuit recently put it, in distinguishing *Broussard* and granting class certification, the class members in that case "entered into contracts that varied materially from each other, had different amounts of information when they entered into those contracts, were exposed to different alleged oral misrepresentations, and relied on those representations to different degrees."  *Minter v. Wells Fargo Bank, N.A.*, 279

---

*Footnote continued from previous page*
the letter discuss gas volumes lost or consumed in transportation and compression such that substantial quantities of gas produced at the well were never sold into "the market."

F.R.D. 320, 328 (D. Md. 2012).[21] Unlike *Broussard*, which involved "unique transactions," *id.*, this case involves leases that are materially the same, and check stubs that are the same. The fact-finder here can determine, as to all Class members, whether EQT's disclosures were adequate.

In *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 327 (4th Cir. 2006), the second case cited by EQT, this Court disclaimed the rule that EQT presses here concerning fraudulent concealment. In *Thorn*, this Court emphasized that despite its conclusion that individual issues relating to the statute of limitations predominated *in that case*, "this conclusion is not born of a view that individual questions necessarily arise any time a defendant raises a statute of limitations defense." *Id.* at 327. The Court found that equitable tolling could not be resolved on a classwide basis where its application would depend on an examination of the particular circumstances of each individual class member. *Thorn*, 445 F.3d at 323-24. That is not the case here, as EQT's omissions were uniform across the *Adkins* class.

The district court correctly found that EQT's assertion of a statute of limitations defense does not defeat class certification.

---

[21] This Court denied permission to appeal class certification in that case. *See* Case No. 12-110, Dkt. 24 (filed Feb. 24, 2012).

### E.     The District Court's Class Definitions Are Proper.

####     1.     Class Members Are Ascertainable.

CNX and EQT complain that the classes are not ascertainable, but mis-state the law on ascertainability in an effort to construct unwarranted hurdles to certification.  There was no error in the district court's class definitions.  Each is defined by reference to objective criteria, allowing for notice to issue, and presents no problems of administrative feasibility, as they are based on CNX's and EQT's own work in identifying Class members.

As many courts and treatises have put it, a class must be "ascertainable," but not necessarily "ascertained." *Manual for Complex Litigation, Fourth* § 21.222, at 270 (Fed. Jud. Ctr. 2004) ("*MCL*"); 1 *Newberg on Class Actions* § 3:3, at 163 (5th ed. 2011).  So long as a court can determine "the general outlines of the membership of the class," then an ascertainable class may be found.  *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 672 (S.D. Fla. 2011) (quoting 7A Wright, Miller & Kane, *Federal Practice & Procedure: Civil 3d* § 1760 (3d ed. 2005)).  The ascertainability requirement thus dovetails with Rule 23's notice provisions, which do not require individual notice in all cases, but only "the best notice that is practicable under the circumstances[.]"  Fed. R. Civ. P. 23(c)(2)(B); *MCL* § 21.311 (describing options for individual notice and publication notice).

The district court correctly stated the ascertainability requirement, *see* A4558-59, and applied it.

The requirement that a class be capable of objective description but that not all class members be named at certification recognizes that class certification is different from individual joinder.  Unlike individual joinder under Rules 19 and 20, Rule 23 class actions are representative suits in which one or a few named parties proceed for a defined group of un-named class members.  Class members need not be identified for adjudicative purposes until the claims stage, should the class prevail on the merits.  Class suits are designed to accommodate a group of similarly situated claimants whose identities may shift as time passes, as with beneficiaries of contracts or trusts (for example, CNX and EQT can continue to add people to the class as it continues to designate illusory conflicts in Board filings).  At the appropriate time, class actions allow for distribution of a recovery or the preclusive effects of a judgment.

Recognizing this, courts routinely certify not only classes of purchasers of consumer products, who cannot be individually identified at the time of class certification, but also classes of real property owners, in cases ranging from trespass claims to environmental exposure, and do not insist that class members come forward with documents proving their ownership throughout the case, or otherwise police the boundaries of the class based on documentation of property

ownership. Instead, courts ensure, as the district court's class definitions here do, that class members can be objectively identified. *See, e.g., A-W Land*, 2013 U.S. Dist. LEXIS 88215 (certifying class of owners of surface estates of various parcels of property); *Jackson v. Unocal Corp.*, 262 P.3d 874, 887-89 (Colo. 2011) (holding that a class of property owners within a geographically defined area is proper, pending the trial court's consideration of expert testimony); *Olden v. Lafarge Corp.*, 203 F.R.D. 254, 269 (E.D. Mich. 2001) (certifying class of single-family residence owners in case involving cement dust emissions); *Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*, 2009 U.S. Dist. LEXIS 82522, at *4-5 (W.D. Okla. July 31, 2009) (approving settlement of previously certified class of property owners).

Here, the classes in the ownership cases can be described and ascertained by reference to objective criteria, allowing the Court to order the best practicable notice. Notice may issue by direct mail to the individuals listed as gas estate owners in the schedules and declarations that CNX and EQT has prepared to place money in escrow or suspense.[22] At the same time that this mailing goes out, notice by publication and via a dedicated website can reach those who have inherited or bought those gas estate interests or who otherwise cannot be identified by

---

[22] In neither of the cases cited by CNX and EQT (Br. at 76) did the defendants themselves prepare the initial list of class members, providing the ability to reach a significant portion of the class individually.

reference to CNX's and EQT's records. This is precisely what Rule 23(c)(2)(B) contemplates when it requires individual notice "to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(b)(2)(B). Those who cannot be identified through such "reasonable effort" can be notified through publication and the website. *See, e.g., In re Motor Fuel Temp. Sales Pracs. Litig.*, 2013 U.S. Dist. LEXIS 101082, at *53-55 (D. Kan. July 19, 2013) (ordering non-individual notice as to class members who cannot be identified "through reasonable effort").[23] Class members who cannot be identified through "reasonable effort," and thus not contacted through individual notice can identify themselves after receiving notice through other means, a procedure routinely adopted in class actions.[24] It is possible that additional records, including the local land records that the district court noted (A4562), may be searched when it is necessary to distribute a class recovery, or to determine who is bound by the

---

[23] *See also* Fed. Juc. Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), available at http://www.fjc.gov/library/fjc_catalog.nsf.

[24] In cases where defendants lacked records, courts rejected ascertainability challenges, and reasoned that class members' ability to identify themselves by reading the class definition and locating their own records was sufficient. *See, e.g*., *Tchoboian v. Parking Concepts*, 2009 U.S. Dist. LEXIS 62122, at *13-14 (C.D. Cal. July 16, 2009); *Parkinson v. Hyundai Motor Am*., 258 F.R.D. 580, 594 (C.D. Cal. 2008) ("Because the proposed class definition allows prospective plaintiffs to determine whether they are class members with a potential right to recover, the defined class is sufficiently ascertainable.").

judgment. However, for the reasons stated below (*see* § V(B)(2)), it is not necessary to perform title searches to identify individual Class members now.

CNX's and EQT's argument confuses class membership with entitlement to damages. The two are distinct concepts. An objective, ascertainable class definition serves the purpose of effectuating meaningful notice under Rule 2(c)(2) and describing those who will be bound by a class judgment. Such a definition may thus include within it those who may not be able to prove individual injury. *See, e.g., Mims v. Stewart Title Guaranty Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009). In such cases, some form of individualized determination of damages may be required if and after the liability questions are adjudicated in favor of the class. *See also* § V(D) below.[25]

CNX and EQT speculate, without any citations to the record in this case, that "mini-trials" would be required to determine class membership. (*See* Br. at 76-77.) But their sole example is of a tract involving disputed gas title, an issue that would need to be resolved independent of this case and is not affected by class certification. This case does not seek to resolve disputed gas title, but only to

---

[25] To the extent that CNX/EQT's ascertainability argument is based on the assertion that the classes, as defined, would include individuals not injured by CNX's and EQT's conduct, courts have consistently rejected that argument, holding that this possibility does not defeat class certification. *See, e.g., In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012); *Kohen*, 571 F.3d at 677.

resolve whether the conflicts between gas owners and coal interest owners without gas interests are genuine conflicts.

Finally, even if some amount of administrative work were necessary, it is not a barrier to finding an ascertainable class, particularly since it would not involve merits determinations. Class cases can pose unique administrative challenges, yet "in identifying members, time and labor alone, even where significant, is not a reason to forego proceeding via a class." *Kendrick v. Standard Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 135694, at *37 (E.D. Ky. Sept. 30, 2010) (citing *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D. Md. 2006)).[26] Further, the need to manually review files is not dispositive. This is so that defendants sued for wrongful conduct do not "escape classwide review due solely to the size of their businesses or the manner in which their business records

---

[26] CNX's other examples of cases (Br. at 11), where courts found determination of class membership to be administratively infeasible only illustrate why these cases pose no such problems. *Solo v. Bausch & Lomb Inc.*, 2009 U.S. Dist. LEXIS 115029, at *18 (D.S.C. Sept. 25, 2009), involved claims for reimbursement of an over-the-counter product, forcing the Court to assess whether the individual had purchased the product (and if so, how much), at what price, whether the product had been discarded (and if so, how much), and whether the individual had received partial reimbursement. *DeBremaeker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970), proposed a class of individuals "active in the peace movement." Unlike here, where the parties can begin with CNX's records, *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999), involved all current and former smokers in 46 states, with no way to track purchasers of cigarettes. Despite the inherent difficulties in notice and claims administration where there are no purchaser records – that is, nearly all consumer class actions involving retail products, many such cases are certified, using the objective definitions the MCL recommends. *See MCL* § 21.222.

were maintained." *Kendrick*, 2010 U.S. Dist. LEXIS 135694, at *38-39. Here, the parties have access to the relevant records and face no substantial difficulties in providing notice to Class members.

### 2. The *Adkins* Class and *Kiser* Subclass Are Ascertainable.

EQT also argues that the *Adkins* class and *Kiser* sub-class definitions' limitation to lessors whose leases do not provide for the deduction of costs poses ascertainability problems. (Br. at 78.).[27] EQT is incorrect. EQT's argument amounts to an assertion that it cannot distinguish among its own lessors. But it makes this distinction in the ordinary course of business; EQT knows how to draft leases that explicitly allow for deductions, and its personnel readily can determine whether particular deductions are allowed for a particular lease. A2382-87; *see also* A2393; A2457.

EQT does not cite a single case for the proposition that a class defined by silence as to costs deductibility poses ascertainability problems. There is nothing confusing – as either a matter of law or fact – about lease language that either does or does not provide for the allocation of costs to the lessor. As a legal matter, courts, including the district court, have specifically held that leases such as the one referenced by EQT (Br. at 78-79) – providing for payment of royalties based

---

[27] Petitioners mistakenly group the *Addison* class into this argument (Br. at 78), but that class contains no such limitation and no subclass equivalent to the *Kiser* subclass.

on proceeds from sales "at the wellhead" – are "silent" as to the allocation of costs.

*See Rogers*, 29 P.3d at 912; *Wellman*, 557 S.E.2d at 265; A766.  As a factual

matter, there is no ambiguity that Ms. Adkins' leases are silent as to cost

deductions, while, for example, Ms. Addison's lease with CNX is not.  *See* A2556-

57.

Substantially the same class definition was approved and successfully

administered in *Anderson v. Merit Energy Co.*, 2008 U.S. Dist. LEXIS 47743 (D.

Colo. June 19, 2008).  There, the class definition was: "All persons and entities to

whom Merit has paid royalties or overriding royalties on natural gas produced

from wells located in Colorado, pursuant to leases or overriding royalty

agreements *that do not expressly authorize the deduction of the costs incurred to*

*market such natural gas* after it is severed from the wellhead (collectively,

'Royalty Agreements')."  *Id.* at *3 (emphasis added).  The class and sub-class

definitions present no ascertainability problems.

### 3.    The Classes Are Not "Fail-Safe."

The classes certified in the ownership cases are properly defined by

reference to objective criteria and are not "fail-safe."  A fail-safe class "is defined

by reference to the merits of the claim."  *Melton v. Carolina Power & Light Co.*,

283 F.R.D. 280, 288 (D.S.C. 2012).  The class definitions here "avoid subjective

standards (e.g., a class member's state of mind) or terms that depend on resolution of the merits (e.g., 'persons who were discriminated against')."  *MCL* § 21.222.

The ownership classes include "each person, or their successors-in-interest, who has been identified by [EQT or CNX] as the unleased owner of gas estate interests" in tracts in which the operator identified the current owners' or their predecessors'-in-interest rights "as being in conflict with a person or persons identified by [EQT or CNX] as owning coal estate interests and not gas estate interests in the tract…."  A5254 (*Adair*); A5262 (*Hale*); *see also* A5265 (*Kiser*) (referring to voluntary gas lessors); A5257 (*Addison*) (same).  This definition does not turn on any merits determinations.  In arguing that it does, CNX/EQT conflate gas ownership, which they researched and presented to the Board, and which is objectively determined by reference to their submissions, and if necessary, documents that update that work, with entitlement to CBM proceeds, a merits question the district court has not decided yet.[28]

The district court made this distinction clearly.  After noting that the plaintiffs "seek judgment that they, as gas owners, are entitled to the CBM royalties withheld," the district court went on: "Whether such relief may be granted by this court based on the *Harrison-Wyatt* decision – or not – is a question held in

---

[28] CNX/EQT concede this point in a footnote, writing, "[T]o the extent 'gas estate interest' includes CBM interest, the class definitions are impermissibly fail-safe." (Br. at 74 n.14.)  Whether "gas estate" designates CBM interest as against a coal-only interest is the very question that CNX/EQT dispute and that must be resolved.

common by each of the named plaintiffs and the proposed class members in these four cases and is subject to a common resolution." A4567.

Further, and contrary to CNX/EQT's assertions (Br. at 39), Class members would suffer adverse consequences if the Class was certified and the Court then declined to grant the declaratory relief sought in this case: that the conflicts that CNX/EQT asserted are illusory. Class members would be precluded from arguing that very point, forced to replicate, in hundreds or possibly thousands of individual adversary proceedings, the work that CNX/EQT already performed, and be precluded from the use of one method of proof. Fail-safe classes are not permissible, but these classes do not fall into that category.[29]

Although Petitioners complain that the district court did not address their arguments on this issue (Br. at 80), they cite no authority that such silence is an abuse of discretion, especially in as meticulously detailed an opinion as the order under review. The district court is under no obligation to address every argument from the parties, regardless of its merit. This Court has held, where an issue has been fully presented, "A court need not engage in ritualistic incantation in order to

---

[29] Appellees' authority (at 79-80) highlights the difference between these cases' objectively defined classes and definitions that require a merits determination to determine class membership. *See Randleman v. Fidelity Nat'l Title Ins.*, 646 F.3d 347, 352 (6th Cir. 2011) (noting that previous class included only those who were "entitled to relief"); *Genenbacher v. Centurytel Fiber Co.*, 244 F.R.D. 485, 487-88 (C.D. Ill. 2007) (class definition based on a class member not having consented to the installation of fiber optic cables was impermissible).

establish its consideration of a legal issue …. Consideration is implicit in the court's ultimate ruling." *U.S. v. Davis*, 53 F.3d 638, 642 (4th Cir. 1995). *See also Thorn*, 445 F.3d at 322 (refusing to assume "that simply because the district court did not mention the report in its written order it failed to consider the evidence").

### F.    Individual Damages Issues Do Not Defeat Predominance of Common Issues As to Plaintiffs' Tort Claims.

#### 1.    Damages Issues Do Not Predominate.

Contrary to settled authority from the Supreme Court, this Court, and other circuits (including a detailed opinion from the Fifth Circuit from only two weeks ago), CNX/EQT argue that purported individual issues relating to damages render class certification of Plaintiffs' tort claims, under Rule 23(b)(3), an abuse of discretion.[30] (*See* Br. at 81-84.) This argument misconstrues the Supreme Court's recent holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), mischaracterizes Plaintiffs' theory of liability in each of these cases, and has been rejected in post-*Comcast* decisions from the Fifth, Sixth, Seventh, and Ninth Circuits. The district court followed well-established authority, and properly exercised its discretion, in finding predominance of common questions where numerous liability questions can be resolved classwide and individual damages calculations follow.

---

[30] CNX/EQT's argument is inapplicable to the district court's certification of the claims relating to ownership conflicts and an accounting, under Rule 23(b)(2), which does not require predominance of common questions.

As the Sixth Circuit recently held, an "orderly analysis" of Rule 23(b)(3)'s predominance requirement should begin with *Amgen*, 133 S. Ct. at 1194-1195, "followed by *Comcast Corp.*, which was decided one month later." *In re Whirlpool*, 722 F.3d at 858. In *Amgen*, the Supreme Court held that "Rule 23(b)(3) … does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.' [quoting dissent]. What the rule does require is that common questions 'predominate over any questions affecting only individual [class] members.' Fed. Rule Civ. Proc. 23(b)(3) (emphasis added)." *Amgen*, 133 S. Ct. at 1196. The *Amgen* court directs courts to assess whether a class' claims will "prevail or fail in unison." *Amgen*, 133 S. Ct. at 1191. Here, Class members' royalty underpayment claims will do just that.

For example, CNX and EQT uniformly deduct severance taxes from all deemed lessors' royalties. A4573 ("CNX has admitted it has deducted severance and license taxes when calculating royalties since January 1, 2004."); A2290-91 (EQT interrogatory responses). Whether CNX and EQT are entitled to do so is a claim on which all *Hale* and *Adair* Class members will "prevail or fail in unison," because CNX's and EQT's practices do not vary as to them. Similarly, CNX provided to the Board a single, uniform deduction rate that it applied to all deemed lessors. *See* A4245; SA 3-4. Whether those costs are excessive is a question common to all Class members. The question of whether CNX may pay royalties

on one price for the sale of gas while realizing profits for a hedge price is another question that is common to all Class members. A4194. EQT confirmed that it is "company policy" to take deductions from royalties absent an express prohibition against doing so, A2387, and that within the fields from which it takes deductions, EQT takes the same deductions, including severance taxes, pipeline capacity charges, gathering and compression charges, and selling, general, and administrative charges from the sales price. A2290-91. Even if subsequent calculations are necessary to determine individual damages amounts, deciding these common questions once – whether the deductions are proper or not – is preferable to forcing Class members to litigate them repeatedly (or, more likely, never litigate it at all). *See McReynolds*, 672 F.3d at 491 (holding that it is preferable to determine in a single trial whether the challenged practices were unlawful).

Here, Class members' entitlement to damages will flow from common liability questions – the legality of the various uniform deductions and royalty accounting methods described above – that can be decided on a classwide basis. This distinguishes this case from *Comcast*, where the Supreme Court reversed an order granting class certification where the antitrust plaintiffs' damages model "purporting to serve as evidence of damages … must measure only those damages attributable to that theory," and the proffered model did "not even attempt to do

that." 133 S. Ct. at 1433. The Supreme Court's primary concern was a mismatch between the theory of liability and the measure of damages. In other words, as the Ninth Circuit has held, *Comcast* simply means a plaintiff "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

Plaintiffs' claims for damages stem from the actions that they allege create CNX's and EQT's liability, and turn on questions common to all Class members, fully satisfying *Comcast*. Once those common liability questions, such as the legality of certain deductions, are adjudicated, the Court can proceed to determine individual Class members' entitlement to different damages amounts (or, if CNX and EQT prevail, this step will not be necessary).

On January 10, 2014, the Fifth Circuit, as it affirmed certification of the settlement class in the *BP* litigation, unequivocally rejected the argument, identical to CNX/EQT's here (*see* Br. at 83), that *Comcast* "precludes certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement." *In re Deepwater Horizon*, 2014 U.S. App. LEXIS 575, at *62 (5th Cir. Jan. 10, 2014). This argument, held the Fifth Circuit, "is a significant distortion of *Comcast*, and has already been considered and rejected by the Seventh Circuit, the Sixth Circuit, and the Ninth Circuit in the months since *Comcast* was decided." *Id.* at 68-69 (citing *Butler v. Sears Roebuck*

& *Co.*, 727 F.3d 796, 800 (7th Cir. 2013); *In re Whirlpool Corp.*, 722 F.3d at 860; and *Leyva*, 716 F.3d at 514; *see also McReynolds*, 472 F.3d at 491.  As the Fifth Circuit emphasized, *Comcast*'s holding "has no impact on cases such as the present one, in which predominance was based not on common issues of damages but on the numerous common issues of liability."  *Id.* at *63.

Having applied various deductions to their royalty calculations, it is not difficult for CNX/EQT to reverse those costs as to individual Class members; they cannot contend that it is capable of engaging in those practices for their own benefit but subsequently incapable of making Class members whole.  *See Schear v. Food Scope Am., Inc.*, 2014 U.S. Dist. LEXIS 3454, at *25-26 (S.D.N.Y. Jan. 10, 2014) ("[F]ar from being a painstaking endeavor, the damages could be mechanically calculated with relative ease, particularly in light of modern software technology, such as Microsoft Excel.") (internal quotations omitted).[31]

### 2.     Monetary Damages Are Not the Primary Goal of the Claims Certified Under Rule 23(b)(2).

CNX/EQT's final argument is that Rule 23(b)(2) certification of the claim for an accounting of CNX's and EQT's handling of royalties owed to Class

---

[31] CNX and EQT's counterclaims, to which they make cursory reference (Br. at 84), do not affect the predominance analysis, and CNX and EQT make no attempt to show how they would.  The counterclaims are purely contingent on a finding of underpayment by CNX/EQT after the determination of ownership and the accounting that Plaintiffs seek for themselves and Class members.  A5013 (EQT); 5105 (CNX).  The counterclaims will not, then, disrupt the progress of this litigation.

members was an abuse of discretion because, according to CNX/EQT, this claim is one for monetary damages. (Br. at 84.) CNX/EQT's argument is directed only at the accounting, and not at Plaintiffs' claim for a declaration that the ownership conflicts that CNX/EQT designated do not exist. There was no abuse of discretion in certification of the claim for an accounting under Rule 23(b)(2); an accounting is a classic group remedy on behalf of a cohesive class.

In creating the Class through their designation of illusory CBM ownership claims, CNX/EQT have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). An order directing an accounting CNX/EQT's handling of Class members' funds is an example of a "single injunction or declaratory judgment [that] would provide relief to each member of the class," as the Supreme Court endorsed in *Dukes*. 131 S. Ct. at 2557. That Class members would then be entitled to receive money as a result of this declaration in no way prevents certification under Rule 23(b)(2). As the Sixth Circuit held last year, "[C]ertifying declaratory relief under Rule 23(b)(2) is permissible even when the declaratory relief serves as a predicate for later monetary relief, which would be certified under Rule 23(b)(3)." *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 428-49 (6th Cir. 2012). The escrowed and suspended funds are funds "incidental to requested injunctive or declaratory relief"

because they are "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief."[32]  *Allison v. Citgo Petroleum*, 151 F.3d 402, 415 (5th Cir. 1998) (cited and discussed by *Dukes*, 131 S. Ct. at 2560) (emphasis in original).  The money that Class members will be entitled to depends upon, flows from, and is *incident to* the requested declaratory relief.[33]

Finally, CNX/EQT incorrectly argue that, with respect to an accounting, Plaintiffs have not identified an action or refusal to act on grounds that apply generally to the class.  (Br. at 85.)  At a minimum, CNX's and EQT's argument that an accounting is not necessary or appropriate raises yet another common question that can be resolved in one stroke.  Contrary to CNX's and EQT's contention, Plaintiffs have shown, and the district court detailed, the lack of any proper accounting of CNX's and EQT's handling of the money they were obligated to put in escrow, while the limited audits to date that have shown

---

[32] They are arguably not damages at all, as they are part of an already-existing fund to which Class members are entitled.

[33] *Hammett v. Am. Bankers Ins. Co. Fla.*, 203 F.R.D. 690, 696 (S.D. Fla. 2001), Petitioners' sole authority (Br. at 85) for this argument, is distinguishable.  There, the Court held that the proposed class members, a nationwide class of insureds, "are neither bound together by a legal relationship or a significant common trait and thus lack the class cohesiveness that distinguishes (b)(2) from (b)(3) actions."  Here, EQT and CNX themselves, pursuant to a single statute, created the class through their conduct in designating a conflict, conferring on each Class member the same status of conflicting claimant and forcing each Class members' money into escrow.

mishandling of those funds, including late payments, underpayments, and other errors.  *See* A2743-88; A4524-30.  "Finding 1" by the Board's hired auditor was, "A proper accounting of the escrow accounts held within the pooled bank account(s) is not taking place."  A4525.  The auditing firm halted its audit after finding errors in the account balances for five of the first six wells that it analyzed, concluding that any further work would be futile, as additional testing, even with no further errors, would not yield an acceptable error rate.  *Id.*  To this day, CNX and EQT have not had to account for their actions in handling the millions of dollars entrusted to them as CBM operators.

Plaintiffs' accounting claim seeks a uniform, single remedy.  It is a long-recognized remedy available, as the district court recognized, where a lessor seeks "to determine what, if any, amounts are owed pursuant to a mineral lease." *Addison v. CNX Gas Co., LLC*, 2011 U.S. Dist. LEXIS 50276, at *22-23 (W.D. Va. May 13, 2011), *adopted in full*, 2011 U.S. Dist. LEXIS 110724 (W.D. Va. Sept. 28, 2011) (citing *Pepper v. Dixie Splint Coal. Co.*, 165 Va. 179, 181 (Va. 1935)).  Class members, none of whom have received a proper accounting during the time their royalties have been held in escrow, are entitled to this uniform remedy – simply, an accounting of CNX/EQT's handling of their money.  There was no error in the district court's certification of this claim under Rule 23(b)(2).

## VI. <u>Conclusion</u>

For the foregoing reasons, Plaintiffs-Respondents-Appellees respectfully request that the Court deny Defendants-Petitioners -Appellants' petition for permission to appeal the district court's order, or in the alternative, affirm the district court's certification of the classes if the Court grants permission for leave to appeal.

Respectfully submitted,

Dated:  January 27, 2014                LIEFF CABRASER HEIMANN &
                                             BERNSTEIN, LLP


By: <u>*/s/ Elizabeth J. Cabraser*</u>
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008
<u>ecabraser@lchb.com</u>

David S. Stellings
Daniel E. Seltz
LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
<u>dstellings@lchb.com</u>
<u>dseltz@lchb.com</u>

Jackson S. White, Jr., VSB #03677
THE WHITE LAW OFFICE
P. O. Box 286
Abingdon, VA 24212
Telephone:   (276) 619-3831
Facsimile:    (815) 550-2930
jackwhite@whitelawoffice.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the Type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   The page count of this brief is 17,799 words, excluding the items that may be excluded under Federal Rule 32(a)(7)(B)(iii), and this Court's December 10, 2013 Order provided for principal briefs not to exceed 21,000 words.

2. This brief complies with the typeface requirements of Fed. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

January 27, 2014                    */s/ Daniel E. Seltz*
                                    Daniel E. Seltz

## **CERTIFICATE OF SERVICE**

The undersigned counsel does hereby certify that he has this day caused to be served a true and correct copy of the above and foregoing on counsel of record via CM/ECF filing.

This the 27th day of January, 2014.

/s/ Daniel E. Seltz
Daniel E. Seltz